**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TACTICAL INTERMEDIATE HOLDINGS, INC., *et al*,.[1] | Case No. 14-11659 (   ) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF CARLIN ADRIANOPOLI IN SUPPORT**
**OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, CARLIN ADRIANOPOLI do hereby declare, under penalty of perjury, that:

1.      I am the Chief Restructuring Officer of each of the above captioned debtors and debtors-in-possession (collectively, the "***Debtors***" or the "***Company***").  I have served as  Chief Restructuring Officer since February 21, 2012.  In my capacity as CRO of the Debtors, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On July 8, 2014 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 1015-

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Tactical Intermediate Holdings, Inc. (4895); Tactical Holdings Operations, Inc. (8504); Wellco Enterprises, Inc. (9274); Ro-Search Incorporated (6293); Mo-Ka Shoe Corporation (2446); Altama Delta Corporation (6369); Altama Delta (Puerto Rico) Corporation (3459); Massif Holdings LLC (1692); and Massif Mountain Gear Company L.L.C. (9717).  The address of the Debtors' corporate headquarters is 5968 Commerce Blvd., Morristown, TN 37814.

1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

3.       I submit this declaration (this "***First Day Declaration***") to provide an overview of the Debtors and these chapter 11 cases, as well as  to support the Debtors' chapter 11 petitions and "first day" motions (each, a "***First Day Motion***," and collectively, the "***First Day Motions***")[2] and to support further relief that will be requested in these cases.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.       I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## Introduction

5.       Today is the result of a culmination of events that created a perfect storm for these Debtors and necessitated the filing of these cases.  While the Debtors have experienced financial difficulties in the past, in October 2012 the Debtors effectuated a comprehensive out of court restructuring that was supported by the Debtors' senior secured lender, Wells Fargo Bank, N.A. ("***Wells Fargo***"), the Debtors' second lien lender, GGC Tactical Debt Holdings, LLC (the

---

[2] All capitalized terms not otherwise described herein shall have the meanings ascribed to them in the relevant First Day Motion.

"*Second Lien Lender*"), the Debtors' ultimate equity holders, affiliates of Golden Gate Capital (the "*Sponsor*"), and certain minority owners in Massif Holdings LLC (the "*Class B Shareholders*").  The out of court restructuring provided the Debtors with necessary liquidity through a new second lien loan from the affiliates of the Sponsor, a modification of the Debtors' first lien facility with Wells Fargo to ensure operating breathing room through borrowing base enhancements and covenant relief, and the elimination of approximately $18 million in an earnout liability of the B Holders, of which approximately $9 million was past due at the time. The 2012 Restructuring, which was negotiated over many months, came at a critical juncture; absent the infusion of liquidity and relief under the Wells Fargo credit facility, the Debtors business would have deteriorated massively and it would been impossible to win future business and ultimately survive.  In tandem with the restructuring, and in an effort to help turnaround the operations, the Debtors replaced the management team, won two significant government contracts in the Footwear division (defined below),  and undertook significant efforts to reduce costs and drive improved performance.

6.      In the midst and on the heels of these necessary restructuring efforts,  the Debtors received three subpoenas related to two different governmental investigations (as more fully described below) in July and September of 2012 and May of 2013.  These investigations ultimately created downward pressure on the Debtors liquidity and created additional challenges to operations.  The Debtors have cooperated and continue to cooperate fully with government investigators in an ongoing effort to resolve these investigations.  In connection therewith, in 2013 the Debtors obtained modifications to their loans in an effort to continue improving performance but the  quarantine of certain inventory, the investigations, a significant reduction in

government apparel sales, and a challenging operating environment provided headwind in the face of developing a clear path to a solution.

7.      The government investigations and collateral impact that such investigations have had on liquidity and operations have directly impaired the Debtors' turnaround efforts and, at various intervals over the last six months, threatened the Debtors' viability.  But through the persistence and support of their key stakeholders and the Sponsor, the Debtors have developed a path to ensure that value is maximized for the benefit of all creditors.  This path, however, requires the Debtors to act with great speed.  More specifically, the Debtors intend to sell their two business lines separately to realize the most value available under the circumstances.  The Debtors' have been working with the government agents with respect to transitioning their contracts to new buyers and the Debtors have had significant success to date.  Although the government is pleased with the Debtors performance under their programs, the government must ensure that it has a supply source to fulfill its needs.  If the Debtors are unable to quickly transition the programs to buyers, the government will be forced to seek alternative sources for its purchases.  Accordingly, the Debtors must complete these sales on an expedited basis to avoid a likely shut down in operations.

8.      Moreover, the Debtors have also been able to negotiate and file a chapter 11 plan (the "***Plan***") that will ensure an appropriate completion to these cases.  The Plan, described in more detail below, will allow the Debtors to complete their restructuring and fully resolve these cases promptly, thereby avoiding what has become a common practice of languishing in this Court with no clear exit path.  This was something that was extremely important to the Debtors and something for which the Debtors fought extremely hard.

9.     The Debtors have entered into a plan support agreement (attached hereto as **Exhibit A**, the "***Plan Support Agreement***") with Wells Fargo and the Second Lien Lender in order to ensure their smooth and timely completion of this restructuring.  The Plan, the Plan Support Agreement, and the proposed debtor-in-possession financing all contemplate milestones to ensure that the case progresses and that the maximum value for creditors is captured and preserved through this process.  The Debtors' failure to meet such milestones would result in a breach of the debtor-in-possession financing and in turn breach the Plan Support Agreement. More specifically, the milestones contemplate as follows:

- The commencement of these cases on or before July 8, 2014;

- The filing on the Petition Date of:

    o   A sale motion relating to Footwear (as defined below);

    o   A sale procedures motion relating to Footwear;

    o   A sale motion relating to Massif (as defined below);

    o   A sale procedures order relating to Massif; and

    o   A plan of liquidation and a disclosure statement;

- The entry of bidding procedures orders relating to Footwear and Massif by August 5, 2014;

- The entry of sale orders relating to Footwear and Massif by August 27, 2014; and

- Closing of the Footwear and Massif sales by September 12, 2014.

A.     **Overview of the Debtors' Business**

    a.     ***Company Background***

10.     The Debtors' business currently includes two major business lines – a footwear line ("***Footwear***") and an apparel line, including flame resistant material ("***Massif***").  Footwear is comprised of the Altama group ("***Altama***") and the Wellco Group ("***Wellco***").  These entities

are managed and overseen by the management team at Tactical Holdings Operations, Inc. ("**THO**").

**The Footwear Business**

11.     Wellco was founded in 1941 and manufactures and sells combat boots, primarily for the United States Military as well as commercial uniform and work boots for a variety of customers.  Altama was founded in 1969 and manufactures and sells boots for the United States and international militaries as well as for federal, state and local agencies, military schools, police, uniform shops and Army/Navy retailers.  Combined, Altama and Wellco are the largest domestic supplier of boots to the United States Military.

12.     Altama operates out of three manufacturing facilities: two in Lexington, TN and one in Salinas, Puerto Rico.  Wellco operates out of one facility located in Morristown, TN. Together, Altama and Wellco have approximately 330 employees, all of which are non-union.

13.     *ALTAMA.*   Altama was founded in 1969 in Darien, Georgia. Originally a children's shoe plant, the facility was converted to manufacture olive drab jungle boots for United States Soldiers serving in Vietnam. Since 1969, Altama has been a leading manufacturer of Mil-Spec boots for the United States Department of Defense, supplying to thousands of military personnel worldwide. In addition to the United States Military, Altama markets and distributes its products to federal, state and local agencies, military schools, police, Special Forces, uniform shops and Army/Navy retailers.

14.      In 1991, following Operation Desert Storm, Altama developed a line of high performance combat boots for civilian use with the traditional Panama sole. These boots combine the design features of our Mil-Spec boots and are made using the same knowledge gained from that experience. To achieve more traction for road marches, soldiers began taking their boots to shoe repair shops and resoling them with "saw tooth" bottoms. Therefore in 2003,

Altama began manufacturing Original Ripple Sole Boots and was the first company to make them available for civilian use.

15.     Altama's Hoplite® series was introduced in 2008.  Due to the success of the tan Hoplite®, Altama introduced the sage color allowing Altama to reach the United States Air Force.

16.     Based on Altama's extensive knowledge and experience in designing and producing high performance combat footwear, three series of tactical boots with a new level of comfort in mind for the law enforcement and public safety footwear markets were developed. The LITESpeed, EXOSpeed and Ortho-TacX® Series have been developed with some of the most technical and high end materials on the market today. These lightweight styles are focused on ultimately reducing fatigue and enhancing on-the-job performance.

17.     In 2010, Altama launched the Panamoc® series, a line of footwear designed to appeal to the men and women in the military service branches. These shoes are built for maximum comfort in times when boots aren't required or for after duty wear. The Panamoc® collection is manufactured to Altama's high quality standards providing superior durability, slip resistance, traction and comfort.

18.     ***WELLCO.***  Wellco Enterprises, Inc. began operations in 1941 under its original name, Wellco Shoe Corporation.  Wellco goes back to the nineteenth century when the grandfather of the founding partners started the family's first shoe factory in Germany. In the early 1930's, the German company developed the first practical method for molding and attaching a rubber sole to a shoe upper in a single vulcanizing operation. The German company had the foresight to patent this technology worldwide.

19.     Early on, the principals of Wellco founded another company, known as Ro-Search Inc., which specialized in licensing the partners' patented technology to other manufacturers around the world and in manufacturing the specialized molds and presses required for the use of their processes. Ro-Search still survives today as a subsidiary of Wellco.

20.     When Wellco began manufacturing, it specialized in light-weight slippers and casual footwear with sponge rubber soles. Except for a brief time, during World War II when the use of rubber was restricted to defense purposes, Wellco continued to manufacture and market such footwear, trademarked Wellco Foamtreads, until approximately 1985.

21.     In 1965, the Army adopted Wellco-Ro-Search technology for the manufacture of its hot-weather boots, and this product thus became known as the "Vietnam Boot." Later the technology used to manufacture the Vietnam Boot was adopted for all Army combat footwear. Wellco became a prominent supplier of such footwear to the United States Military in 1965, and the remainder of the Army's needs were supplied for a number of years by three other companies, all of them using Ro-Search supplied molds and presses, as well as technical advice. To this day, the technology is used to manufacture military combat boots.

22.     True to its heritage as a developer of footwear manufacturing technology, Wellco's subsidiary Ro-Search Inc., perfected and patented in 1957 a new technique for molding and attaching a rubber sole to a welted upper. This was known as "Process 82," to indicate that it was considered to be twenty five years ahead of its time.

23.     Through the years, Wellco and Ro-Search have participated in numerous further developments of combat footwear for the United States Military.  For instance, a desert boot was developed and adopted in 1991 to include features and improvements specified by General Schwarzkopf for Operation Desert Storm.  The present generation of combat boots, with a direct-

molded rubber base sole, a polyurethane midsole and a rugged high-traction rubber tread sole can be traced to a development contract awarded to Ro-Search in 1995 by US Army Natick Laboratories. Similarly, the first military blast-protective boots and overboots were developed and produced by Wellco and Ro-Search.  In 2009 Wellco opened its state of the art facility in Morristown, TN, which is one of the largest footwear molding facilities in North America.

### The Massif Business

24.     Headquartered in Ashland, Oregon, Massif was founded in 1999 by a group of veteran search and rescue team members and alpine climbers who believed that the options for sanctioned fire resistant protective gear at the time were too limited.  Today, Massif is a world leader in supplying flame resistant and high performance outdoor apparel to the military, law enforcement, search and rescue professionals, and the wildland firefighting community.  Massif is also the primary supplier of the United States Department of Defense's flame resistant clothing programs.  In addition, Massif has had success in the international market and has had an international sales network in place since 2011.

25.     In May 2009, THO acquired Massif from the Class B Shareholders.  As part of the transaction, the Class B Shareholders retained a minority interest (25%) in debtor Massif Holdings LLC.  Subsequent to the acquisition, certain disputes relating to the retained equity interest arose among the Class B Shareholders, Wells Fargo, Massif Holdings LLC, Tactical Holdings Operations, Inc., and the Sponsor.  These disputes were resolved as a part of the 2012 restructuring, in which significant new capital was infused into the Debtors, the Debtors' balance sheet was further improved by removing over $18 million in balance sheet liabilities attributable to amounts owed to the Class B Shareholders, and Massif Holdings LLC's Limited Liability Company Agreement was amended to eliminate further payment obligations in respect of the equity held by the Class B Shareholders other than upon a Massif sale.

26.     Since 1999, Massif has invested countless engineering hours designing a new generation of performance flame resistant fabrics and garments; the foundation of each garment is a proprietary blend of high quality fabrics selected for the optimal combination of flame resistance, weight, strength, breathability, stretch, comfort, moisture management, and durability. Massif has developed fourteen (14) proprietary flame resistant fabrics with multiple variations, which fact has contributed to Massif never being displaced from any of its contracts with the United States Military, from whom it has receives the highest approval ratings of any flame resistant providers.  Massif products have helped to prevent or minimize countless burn-related injuries to military and firefighting personnel.

27.     As a flame resistant solutions-provider, the Company works with its customers and partners to design and engineer new products to meet the changing needs of end users.  The Company is beginning to gain traction in exporting its successful products for the United States Military to foreign customers in Europe and the Middle East.  Historically approximately 80% of the Company's revenue is derived from design-spec contracts where Massif was the main provider.

### Tactical Holdings

28.     Tactical Holdings was incorporated in 2008 and holds the Altama, Wellco, and Massif businesses.   The Debtors own their facility in Morristown, TN, which includes administrative offices, a production facility, and a finished goods warehouse.  The Debtors also lease a warehouse in Morristown, TN that holds, among other things, over 40,000 pairs of boots quarantined pursuant to certain government investigations.  The Debtors own their production facility in Lexington, TN, and lease a warehouse at the same location for finished goods and raw materials.  The Debtors lease their facility in Salinas, Puerto Rico.   The Debtors lease the Massif facility in Ashland, OR.

b.    *Industry Overview*

29.    <u>Public Safety Supply</u>.  According to a report by Homeland Security Research Corp., annual investments in public safety products and services purchased by United States federal agencies and the private sector increased from $48 billion in 2011 to $51 billion in 2012. Spending is predicted to increase to $81 billion by 2020.  The total United States public safety market (including homeland security products) is predicted to expand at an annual rate of 4.7% in the next several years, from $74.5 billion in 2012 to $107.3 billion in 2020.

30.    <u>Military Textiles</u>.  According to the National Council of Textiles Organizations ("***NCTO***"), more than 8,000 different textile items are purchased annually for use by the United States Military.  When individual sizes are factored into the mix, this figure increases to more than 30,000 items.

31.    The United States textiles industry provides more than $2.0 billion annually in military products for the government. United States textile producers provide the United States armed forces with a wide selection of uniforms and high-tech protective apparel products, as well industrial fabrics that are essential to the operation of certain military equipment.  The NCTO noted the importance of such products to the government, as one former Secretary of Defense stated, "(Textiles are) second only to steel in importance to the Armed Forces of the United States."

32.    Textiles utilized by the United States armed forces must be domestically produced. Military purchases of such products are covered by the Berry Amendment, which requires that textile and apparel products sold to the Department of Defense be domestically sourced and created. United States companies are also entitled to sell military textiles to certain allied countries, such as Australia and the NATO countries.

33.    <u>Specialty Fabrics</u>.  Military textiles represent a segment of the specialty fabrics industry, which also includes geotextiles, transportation fabrics (such as automotive seating), and recreation fabrics for awnings and marine applications.  In 2012, the world market for specialty fabrics increased approximately 2.5% and is expected to achieve sales growth of 3.0% in 2013.

B.    **Events Leading to the Bankruptcy Filing**

34.    Following the Debtors out of court restructuring in 2012, plant inefficiencies, manufacturing concerns, reduced military purchases, and difficulty with government contracts has led to a run on operating margins and tremendous stress on liquidity.  This has necessitated modifications to the Debtors facility with Wells Fargo on several occasions during the last year.  Additionally, since the summer of 2012, Wellco has cooperated fully with investigations by the Department of Homeland Security ("***DHS***"), the Department of Treasury, Office of Foreign Asset Control ("***OFAC***") and the Department of Defense (the "***DOD***").  As explained below, these investigations have pressured liquidity and impacted the Debtors' day-to-day operations.

35.    The first investigation involved DHS and OFAC subpoenas served on or about July 26 and September 12, 2012 respectively.  The subpoenas both sought information about a transaction between Wellco and an entity allegedly located in Zimbabwe.  After conducting an internal inquiry and searching for responsive materials, Wellco cooperated and provided documents and information in response to the government's subpoenas.  Additionally, on January 18, 2013, Wellco provided a detailed written submission to OFAC.  Pursuant to its Cautionary Letter, date July 17, 2013, OFAC concluded its investigation and did not impose sanctions or penalties against Wellco.  Wellco is working with OFAC to obtain the seized funds or the boots.

36.    The second investigation also involved DHS, beginning with a subpoena that was served on counsel for Wellco on or about May 20, 2013.  DHS, later joined by DOD and other

military investigators, sought information about the country of origin for several Wellco boot styles that were produced and sold between 2008-2012.  Wellco has cooperated fully with the government's investigation by, among other things, producing voluminous documents, making 13 current employees available for interviews, voluntarily leading investigators on a tour of the Morristown, TN facilities and voluntarily placing over 40,000 pairs of boots into quarantine. Wellco, through counsel, is in regular contract with the government's investigators, has advised the investigators of Wellco's difficult financial situation, and is working toward resolution of the government's investigation.

37.    Wellco's cooperation in these investigations, however, has increased expenses and demands on personnel.  For example, Wellco has devoted significant resources to pursuing its internal investigation and document review efforts.  Also, Wellco's voluntary quarantine of over 40,000 pairs of boots has meant that these boots are not available for sale.  Wellco is working with the government to identify subsets of the quarantined boot styles that may be cleared for sale, but this process has proved to be difficult, labor intensive, and time-consuming. THO has also developed a comprehensive compliance program for all of the operating entities.

38.    The two government investigations have imposed a significant liquidity strain on the Debtors.  Moreover, the pending investigation and uncertainties as to its outcome have negatively impacted the Debtors ability to obtain additional financing and/or to engage in transactions outside of a formal chapter 11 process.

39.    Massif has leveraged its products to be a main provider on a significant number of its contracts.  Massif projects current year revenue from these main government contracts to comprise over 80% of its total revenue.  The Debtors have been engaged in marketing Massif since late 2013.  The original intent was to effectuate an out of court sale or investment.  Due to

the recent performance of Massif, and the inability to meet financial projections from continued customer purchase reductions and government camouflage pattern changeover delays, the original expressions of interest declined significantly in value.

40.      Both Footwear and Massif have a significant amount of their business with governmental entities and thus are subject to large swings in revenue and profit based upon the impact of current events, foreign policy, and the preferences within individual governmental programs.  The Debtors have experienced a confluence of multiple negative events that have pushed against the profitability of the Debtors and challenged their liquidity position, necessitating this restructuring.

C.      **The Debtors' Capital Structure**[3]

41.      Tactical Intermediate Holdings, Inc., ("***TIHI***") is the direct or indirect parent of all of the other entities.  TIHI holds 100% of the stock of Tactical Holdings Operations, Inc. ("***THO***").  THO has three first tier subsiaries: Wellco Enterprises, Inc. ("***Wellco***"), Altama Delta Corporation ("***Altama***"), and Massif Holdings LLC ("***Massif Holdings***").  THO holds 100% of the stock of Wellco and Altama and 75% of Massif Holdings.  Wellco holds 100% of the stock of each of Ro-Search Incorporated and Mo-Ka Shoe Corporation.  Altama holds 100% of the stock of Altama Delta Puerto Rico Corporation.  Massif Holdings holds 100% of the stock of Massif Mountain Gear Company LLC ("***Massif***").  The remaining 25% of the stock of Massif Holdings is held by Class B shareholders, which were prior owners of Massif.[4]

42.      THO and all of the entities below THO (collectively, the "***Borrowers***") are borrowers under that certain Loan and Security Agreement dated April 2, 2010 (as amended, the "***Prepetition Credit Agreement***") with Wells Fargo Bank, N.A., successor by merger to

---

[3] A chart of the Debtors' corporate structure, along with the equity holders, is attached hereto as ***Exhibit B***.
[4] The specific holdings of the Class B Shareholders are included in the corporate structure chart attached hereto as ***Exhibit B***.

Wachovia Bank, National Association ("***Wells Fargo***").  The Prepetition Credit Agreement consists of a revolver, a term loan, and bond debt relating to the acquisition of the Lexington, TN facility (the "***Prepetition First Lien Debt***").  As of the filing date, the Prepetition First Lien Debt is approximately $48 million.  The Prepetition First Lien Debt is secured by a lien on all of the Debtors' property.

43.     Pursuant to the Fifth Amendment to the Prepetition Credit Agreement, dated as of May 16, 2013, the Prepetition Credit Agreement was amended to include a bridge loan in the maximum amount of $1,500,000.00 (the "***DIP Bridge Loan***").  The purpose of the DIP Bridge Loan was to provide the Debtors with additional liquidity so that the Debtors would have sufficient time to finalize negotiations with a stalking horse purchaser for the Massif business and to prepare an orderly commencement of these chapter 11 cases.  As of July 7, 2014, the principal amount outstanding under the DIP Bridge Loan was $1,050,000.  The Debtors would not have been able to finalize their stalking horse agreement and would not have entered these chapter 11 cases smoothly had they not had access to the DIP Bridge Loan as they had exhausted their liquidity.  The DIP Bridge Loan was provided with the express condition that the proceeds be used to prepare for a chapter 11 filing and any DIP financing obtained in the cases would be used, in part, to repay the DIP Bridge Loan.

44.     In the two months since the DIP Bridge Loan was provided, the Debtors have been able to (i) finalize a stalking horse agreement for the Massif business that will pay in full virtually all of the trade creditors of that business; (ii) prepare for an orderly bankruptcy filing as opposed to a free fall into a chapter 7 liquidation, and (iii) begin the marketing of the assets related to the Footwear business.  None of this would have been possible without the DIP Bridge Loan.

45.     In 2012, the Debtors were facing significant liquidity constraints as a result of poor operating performance at both Footwear and Massif, a series of reductions to the borrowing base, and unsustainable earnout payments to the B Shareholders.  After many months of arms' length negotiations, the Debtors were able to resolve these disputes through a global out of court restructuring agreement with their key constituents, including Wells Fargo, the Sponsor, and the Class B Shareholder.  As a result of such restructuring agreement, the Sponsor, through certain affiliated entities, provided the Debtors with $7 million in proceeds as part of the issuance of a promissory note (as amended, the "***Senior Secured Promissory Note***"), Wells Fargo provided additional borrowing capacity and the Massif LLC agreement was modified. In addition, the agreement eliminated approximately $18 million in an earnout liability of the B Holders, of which approximately $9 million was past due at the time.

46.     The Senior Secured Promissory Note is a 12% note dated October 5, 2012 in the original principal amount of $7 million.  The Second Lien Lender was granted a second lien on the collateral held by Wells Fargo.  The interest under the Senior Secured Promissory note is capitalized.  As of the commencement of the case, the amount due under the Senior Secured Promissory Note is approximately $8.66 million.

### c.      Proposed Sale of Substantially All Assets

47.     The Debtors intend to pursue a sale of substantially all of their assets pursuant to two separate processes and sales under section 363 of the Bankruptcy Code.  The Debtors have determined that the best method to realize value is to pursue such section 363 sales on an expedited basis for Footwear and Massif.

-16-

**Massif Sale**

48.     Wells Fargo continued to fund the Debtors while the Debtors attempted to find a potential buyer and/or investor in conjunction with a sale process to be conducted through a chapter 11 proceeding.  In February of 2012, I was retained as Chief Restructuring Officer to assist the Debtors in stabilizing cash flows and identifying opportunities to maximize the Debtors' value.  In December 2013, the Debtors retained Houlihan Lokey Captial, Inc. ("*HL*") as their investment banker to assist in this process.

49.     HL prepared marketing materials intended for distribution to prospective buyers of the Massif's assets including a teaser, confidential investment memorandum and the aggregation of key company documents and further analysis for an online dataroom.  HL worked with the Debtors to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

50.     As of the Petition Date, HL and/or the Debtors contacted approximately 46 potential strategic buyers and 124 financial buyers that were interested in Massif, out of which 94 executed confidentiality agreements and requested additional information, 8 submitted initial indications of interest, 7 met with management and conducted due diligence, and 2 visited the Debtors' headquarters.

51.     The Debtors received various offers for substantially all of their assets, either in whole or in parts.  Specifically, the Debtors marketed a potential going-concern acquisition of substantially all of Massif's business assets.  After consultation with their advisors and their Secured Lenders, Massif selected the proposal to be used as a stalking horse.

52.     On July 3, 2014 Massif executed an Asset Purchase Agreement (the "*Stalking Horse Purchase Agreement*") providing for the sale of the Massif Assets to Stalking Horse

Purchaser, the assumption by the Stalking Horse Purchaser of certain liabilities of Massif, and Massif's assumption and assignment to the Stalking Horse Purchaser of certain executory contracts and unexpired leases.  The Debtors also seek to expose the Stalking Horse Purchase Agreement and the Assets for competitive bidding through an Auction pursuant to the Bidding Procedures.  The Debtors have filed a motion to sell the Massif assets as well as a separate bidding procedures motion.

53.     As set forth in greater detail in the Stalking Horse Purchase Agreement, the Debtors' estates will receive approximately $13 million, comprised of an $8 million cash purchase price together with adjustments set forth in the Stalking Horse Purchase Agreement plus a $5 million Contingency Payment for Massif's Assets (the "**Purchase Price**").  Additionally, Massif will assume and assign to Stalking Horse Purchaser the Assumed Contracts as set forth in the Stalking Horse Purchase Agreement.  As a result of such assumption, a vast amount of Massif's creditors will be satisfied in full.

54.     The Debtors presently face the possibility of continued financial deterioration.  However, the Debtors have managed to obtain necessary financing to conduct the Sale proposed herein.  Under the terms of the DIP Facility, the Debtors are required to close the sale by September 12, 2014.  Additionally, the Debtors may not have sufficient liquidity to operate much beyond that point.  Thus, the Debtors have decided to pursue a Sale of the Massif Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

55.     As indicated above, the Debtors have marketed and solicited offers for the Sale of all or any portion of the Massif Assets and have or will continue to do so.  The Debtors believe the sale of the Massif Assets to the Stalking Horse Purchaser will maximize the value of the

Massif Assets and exposing the Assets to Auction will maximize the value of the Massif Assets, if possible.

### Footwear Sale

56.     The Debtors, in consultation with their advisors and the Secured Lenders, have instructed HL to pursue a sale of the Footwear assets.  HL has aggressively marketed these assets and engaged multiple parties in negotiations.  As of the Petition Date, HL and/or the Debtors contacted approximately 22 potential strategic buyers and 33 financial buyers, out of which 38 executed confidentiality agreements and requested additional information, 14 conducted due diligence, and 2 visited the Debtor's headquarters and met with management.  Although the Debtors were able to negotiate a stalking horse purchase agreement for the Massif business, as of the Petition Date, the Debtors have not yet been able to enter into a stalking horse purchase agreement for Footwear.  However, the Debtors have had significant negotiations regarding the sale of Footwear and are hopeful that they will be able to enter into a stalking horse agreement in the near future.

57.     Consequently, the Debtors, in consultation with the Secured Lenders have determined that the best way to maximize value of their Footwear Assets for the benefit of their estates and creditors is to seek approval of an auction sale of the Footwear Assets through a public auction process in Chapter 11, subject to their ability to proceed with a stalking horse should the negotiations be finalized in time for the appropriate bidding procedures to be entered.

58.     The Footwear business is particularly challenging in that the Debtors' liquidity constraints have forced the Debtors to cease continued operations.  The Debtors are completing their manufacturing operations in order to finalize remaining work in progress and fulfill certain obligations to customers.  The Debtors believe that their relationships with governmental entities

are valuable and when combined with their other assets would provide a turn-key opportunity for a potential purchaser. However, the governmental entities with which the Debtors transact business have imposed upon the Debtors a deadline of July 31, 2014 by which the Debtors will need to have transitioned their operations or certain of the governmental contracts will need to be re-sourced to the Debtors' competitors. Accordingly, it is crucial to the value of the Footwear business that it be sold very quickly, so as to preserve the potential for a going concern sale.

       **d.**      **Proposed Plan of Liquidation**[5]

59.    The Debtors have also been able to negotiate and file the Plan, which ensures an appropriate completion to these cases along with the Plan Support Agreement, evidencing the support for the Plan by the Debtors Secured Lenders. The Plan is essential to the completion of this restructuring and forms the basis for the Debtors' ability to file these cases with and conclude the restructuring in a timely manner.

60.    The Plan is a waterfall plan and the proceeds of the sales will be applied in the order of absolute priority. The Plan contemplates that the assets of the estates at the time of confirmation will remain property of the Debtors' estates and be subject to administration by a Plan Administrator. The Plan Administrator will establish the appropriate reserves and then make distributions that follow the distribution priority scheme set forth in the Bankruptcy Code. The recoveries under the Plan will largely be determined by the results of the sales, which are unknown at this point.

---

[5] The description of the Plan contained herein is for summary purposes only and is qualified in all respects by the terms of the Plan. All parties are directed to the Plan for the full and controlling terms of the Plan. Furthermore, this is not a solicitation of acceptance or rejection of the Plan. Acceptance or rejection may not be solicited until a disclosure statement has been approved by the Bankruptcy Court. The Plan is being submitted for approval but has not yet been approved by the Bankruptcy Court.

61.     As the Debtors will not operate after the sales of their assets and the confirmation of the Plan, the Plan contemplates the rejection of any executory contracts that were not otherwise assumed and assigned, or previously rejected.

D.      **First Day Motions**

62.     I reviewed each of the First Day Motions and participated in the preparation thereof.  I believe that, to the best of my knowledge, the facts set forth in the voluntary petitions and the First Day Motions are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Motions.

63.     The relief sought in the First Day Motions will minimize the adverse impact of these cases on the Debtors and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to maximize recoveries to creditors in these cases.

64.     As described more fully below, the Debtors carefully tailored the relief requested in the First Day Motions in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm.

e.      **Motion for Joint Administration**

65.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect all of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases. The Debtors further

believe that in order to optimally and economically administer the Debtors' pending Chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Tactical Intermediate Holdings, Inc. The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.  For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**f.      Motion to Employ and Retain Claims, Noticing and Balloting Agent**

66.     The Debtors request entry of an order appointing Prime Clerk, LLC ("***Prime Clerk***") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' cases. The Debtors' selection of Prime Clerk to act as the claims and noticing agent satisfies the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise. The terms of retention are set forth in the Engagement Agreement annexed as Exhibit A to the Prime Clerk Application; provided, however, that Prime Clerk is seeking approval solely of the terms and provisions as set forth in the Prime Clerk Application and the proposed

order attached thereto. By separate application, the Debtors intend to seek to retain Prime Clerk as administrative advisor in these chapter 11 cases.

67.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

68.     I have reviewed the Prime Clerk Application and verify that the facts set forth therein are accurate, and I believe the relief requested in the Prime Clerk Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the PrimeClerk Application should be approved.

### g.     <u>Cash Management Motion</u>[6]

69.     The Debtors request entry of interim and final orders authorizing the Debtors to (a) continue to operate the Cash Management System, as revised (b) maintain existing business forms, (c) grant administrative priority to intercompany claims and continue to perform under certain intercompany arrangements consistent with historical practices, and (d) schedule a final hearing on the Cash Management Motion.

70.     The Debtors further request that the Court authorize the Banks to (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks

---

[6] A chart describing the Debtors' cash management system is attached hereto as ***Exhibit C***.

before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date and (iii) undisputed, outstanding service charges owed to the Banks and credit card processors as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

71.     The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds by creating status reports on the location and amount of funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds.

72.     These controls are crucial given the significant volume of transactions managed through the Cash Management System on a daily basis.  Additionally, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.

73.     The Debtors have modified their Cash Management System to prior to the Petition Date at the request of Wells Fargo, who is their prepetition senior secured lender and debtor-in-possession lender.  Under the prior Cash Management System, certain of the Debtors' accounts had both receipts and disbursements.  The implemented modification added three new Disbursement Accounts at Wells (x5516, x5524, x5508, as defined below) and one account that operates both as a Disbursement Account and as a Disbursements Concentration Account at Wells (x5490 as defined below).  The effect of this modification was to isolate the receipts and disbursements in the Debtors' Cash Management System.

74.     In the ordinary course of business, certain of the Debtor entities and business divisions maintain business relationships with each other, resulting in intercompany receivables and payables (collectively, the "***Intercompany Claims***").  These business relationships result in certain Debtors funding shared service costs, including employee benefits and payroll, shipping expenses, inventory and supply costs, customer refunds, insurance premiums and professional fees.  Additionally, the Debtors headquarters operations, which service all of the other entities, are conducted out of the Tactical Holdings Operations, Inc. ("***THO***") entity.  THO, however, does not sell any product directly or otherwise generate any revenue.  These costs and revenues are then allocated among the legal entities and business divisions (within the legal entities) resulting in Intercompany Claims.   Indeed, as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the DIP Facility on a postpetition basis), there may be, at any given time, Intercompany Claims owed by one Debtor to another (the "***Intercompany Transactions***") in connection with the disbursement of funds.

75.     The Debtors maintain records of all Intercompany Transactions and, therefore, are able to ascertain, trace and account for the Intercompany Transactions.  At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted and the Debtors would not be able to satisfy certain costs of operating their businesses.

76.     In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates, the Debtors believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date – without

reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

77.     Nonetheless, as soon as practicable after the Petition Date, the Debtors will include "Debtor-In-Possession" on the checks they print electronically.  Further, upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors in possession.  The Debtors have ordered checks with the "Debtor-In-Possession" legend for the new disbursement accounts created to accommodate the DIP Facility.

78.     The Debtors' continued use of their Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition obligations.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, and the Bank Accounts because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations.

79.     Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System will benefit all parties in interest and is in the best interests of the Debtors' estates and creditors.

80.     Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would greatly harm the Debtors and their estates.  Without the Cash Management System, the Debtors would be unable to track incoming receipts and make on-time

payments, precluding the Debtors from determining their current liquidity. This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors failed to remit payment, could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest.

81.    Absent authority enabling the Debtors to continue to operate their Cash Management System, I believe the Debtors would be unable to effectively maintain their financial operations, which would cripple the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest. Additionally, I believe that if the Debtors were required to comply with the United States Trustee Chapter 11 Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend would disrupt the Debtors' business at this critical time. I further believe that maintaining the existing Cash Management System, including their Bank Accounts, will not harm parties in interest because the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.

82.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

h.    **Employee Wages/Benefits Motion**

83.    To minimize the personal hardship that the Debtors' various employees will suffer if certain prepetition amounts are not paid when due or as expected, and to maintain the morale of an essential workforce during this critical time, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition wages, salaries, commissions, incentives, and other compensation and reimbursable employee expenses, (b) authorizing, but not directing, the Debtors to continue employee benefits programs, (c) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition employee obligations (collectively, and as described herein, the "***Employee Obligations***")  and (d) scheduling a final hearing  to consider entry of the Final Order.

84.    Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture.  Accordingly, the Debtors seek the authority, but not the direction, to continue to honor, pay, satisfy or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations in the Employee Wage Motion.

85.    The Debtors believe any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations would cost the Debtors' estates more than the requested payments due to factors such as the cost of losing an employee's knowhow and the cost of replacement of some employees who would be inclined to accept other

-28-

jobs. Failure to make these payments is likely to impair irreparably the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their employees at a time when the employees' support is critical to the Chapter 11 Cases and sale efforts. Moreover, absent the relief requested, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as many employees rely on their wages and benefits to meet their personal financial obligations.

86.    I have reviewed the Employee Wage Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Employee Wage Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion should be approved.

### i.    Customer Programs Motion.

87.    The Debtors request entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) maintain and administer the Debtors' customer-related programs, including Discounts and Promotions, Customer Satisfaction Obligations, and Shipping Programs and (ii) make payments to customers or otherwise honor accrued prepetition obligations owed under their Customer Programs  and to continue, replace, modify or terminate any Customer Program in the ordinary course of business, (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Customer Program Obligations and (c) scheduling a Final Hearing  to consider entry of the Final Order, to the extent necessary.

88.     Absent honoring Customer Program obligations in the ordinary course of business, the Debtors may significantly damage relationships with customers who have come to expect and rely on such Customer Programs, thereby impairing the value of the Debtors' enterprise.  Thus, the Customer Programs are necessary for the Debtors to maintain their value during this critical juncture as well as during the course of these chapter 11 cases.  The Debtors seek the authorization, but not direction, to administer these programs so that they may preserve their goodwill and customer base to the fullest extent possible while progressing with their restructuring.

89.     The Debtors have created numerous long-standing customer relationships.  These relationships have, in large part, been sustained by the Customer Programs, which incentivize sales, develop loyalty and establish (and maintain) customer goodwill.  Any failure to continue the Customer Programs and honor the Customer Program Obligations could erode hard-earned loyalty and customer goodwill, substantially reducing the Debtors' value.  Accordingly, the Debtors seek authorization to, in their discretion, continue the Customer Programs in the ordinary course of business and to honor the Customer Program Obligations, as discussed below, so that customer relationships are maintained and business operations can continue uninterrupted notwithstanding the restructuring process.

90.     Most, if not all, of the Customer Programs are standard practice in the Debtors' industry.  If the obligations under the Customer Programs are not honored, the Debtors risk alienating their customers and encouraging them to purchase products from the Debtors' competitors.  Furthermore, certain of the Customer Programs, such as the warranty programs, are required by the contracts with the customers.  Accordingly, the failure to honor the Customer Programs could endanger the Debtors' payment on such contracts and could erode the Debtors

reputation and brand loyalty, which in turn would adversely impact the Debtors ability to maximize the value of their enterprise.

91.     I have reviewed the Customer Programs Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

### j.  **Utilities Motion**

92.     The Debtors request entry of interim and final orders (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion and the adequate assurance procedures annexed as Exhibit 1 to Exhibit A to the Utilities Motion and (e) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

93.     In the ordinary course of business, the Debtors obtain gas, water, sewer, electric, telephone, internet and other similar utility services from various Utility Providers. A list of the Utility Providers that provide services to the Debtors as of the Petition Date is set forth on Exhibit 2 to the proposed Interim Order submitted with the Utilities Motion.

94.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. Contemporaneously herewith, the Debtors have filed a motion seeking authority to enter into a DIP Facility. The Debtors expect that cash flows from operations and borrowings under the DIP Facility will be sufficient to pay postpetition obligations related to their utility services. To provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit representing an amount equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over the past twelve months – into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date.

95.    If a Utility Provider is not satisfied with the Proposed Adequate Assurance, any such Utility Provider may make Requests for additional or different adequate assurance of future payment pursuant to the Adequate Assurance Procedures. The Adequate Assurance Procedures set forth a streamlined process to enable Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted. More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving a Request upon the Notice Parties (as defined in the Adequate Assurance Procedures) within a specified period of time. The Debtors may then resolve, in their discretion, subject to the DIP Lender's consent, any Request by mutual agreement with the Utility Provider and without further order by the Court. If the Request cannot be resolved, the Debtors request the right to seek a hearing with the Court to resolve the Request. Furthermore, the Adequate Assurance Procedures set forth notice procedures to Utility Providers subsequently added to the Utility Service List. Subsequently added Utility Providers will also be bound by the Adequate

Assurance Procedures. The Debtors request that the relief granted in the Interim Order and the Final Order apply to all Utility Providers rendering utility services to the Debtors and not be limited to those listed on the Utility Service List.

96.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their restructuring.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, seriously jeopardizing the Debtors' restructuring efforts and, ultimately, value and creditor recoveries.  It is critical that utility services continue uninterrupted during the chapter 11 cases.

97.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**k.**     **Pending Tax Payments, Sales Tax/ Use Tax Motion.**

98.     The Debtors (a) collect sales taxes from certain of their customers, (b) incur franchise taxes, (c) incur fees necessary to operate their businesses including license fees, annual reporting fees, and other similar assessments, and (d) remit such Taxes and Fees to various taxing, licensing and other governmental authorities throughout the United States (collectively, the "***Authorities***").  A list of the Authorities is attached to the Tax Motion as Exhibit B.   The Debtors pay the Taxes and Fees monthly, bi-monthly, quarterly, semi-annually, annually as required by applicable laws and regulations.

99.     The relief requested is appropriate because a portion of the Taxes is likely not property of the Debtors' estate under section 541(d) of the Bankruptcy Code.  Moreover, non-

payment of the prepetition Taxes and Fees will cause immediate and irreparable harm to the Debtors because it (a) would cause the Debtors to incur substantial, irreversible tax penalties from governmental authorities that are likely to be paid in full and in cash as priority claims under the Bankruptcy Code, (b) could result in governmental authorities imposing liens related to non-payment of property taxes under the Bankruptcy Code, (c) could prevent the Debtors from operating their businesses and (d) could expose certain directors and officers of the Debtors to personal liability.  Accordingly, the Debtors must continue to pay such amounts as they become due to ensure that they remain focused on operating the business and implementing a successful restructuring.

100.    I have reviewed the Taxes Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**l.    Lien Claimants Motion.**

101.    the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts owed to possessory lien claimants and statutory lien claimants (collectively, and as described herein, the "***Lien Claimants***"), subject to the limitations in the Interim Order and the Final Order and pursuant to a procurement policy, (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Lien Claimants, and (c) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

102.   The Debtors have identified certain prepetition amounts that have accrued and remain unpaid on account of the claims of Lien Claimants.  Because of the substantial harm that may befall the Debtors if the Lien Claimants fail to release the goods in their possession or otherwise move to assert their lien rights, the Debtors seek the authority, but not the direction, pursuant to the Interim Order, to remit payment on account of the Lien Claimants subject to the limitations set forth in the Interim and Final Order.

103.   In the Massif business, the Debtors design and sell product, but contract with third parties for all of the manufacture of the product.  The Debtors do not take possession of the product until it is finished and in some cases never take possession of the product at all – instead shipping directly from the last finisher involved directly to the customer.  The manufacture of the products in this line will often pass through a number of different parties prior to being completed.  For example, the raw material for the Debtors' product may be shipped via third-party carrier to a manufacturer who largely assembles the goods, then to a finisher or series of finishers who complete the goods, and finally to a warehouse where the goods are stored prior to delivery to a customer.  Along this chain, the Debtors' product makes multiple stops in parties that may add value to the product, it may travel through a number of third-party shippers who would have a possessory lien on the product, and it may be stored by various third parties along the path.  Many of these parties are in current possession of the Debtors' property as of the Petition Date and may have incidental possessory liens (collectively, and as discussed below, the "***Possessory Lien Claimants***").  Under the laws of most states, these carriers and warehousemen will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation or storage of the goods.  If the Possessory Lien Claimants' claims are not satisfied, they may refuse to release the Debtors'

property, thereby preventing the Debtors from being able to deliver product to their customers. Furthermore, in certain circumstances, these parties may be entitled to sell the Debtors' goods to third parties in order to satisfy the possessory liens.

104.    In addition to the possessory liens that many of these parties may possess, many of the same parties may have the right, under applicable state law,[7] to assert and perfect statutory liens, which attach to the Debtors' personal property (collectively, the "***Statutory Lien Claimants,***" and together with the Possessory Lien Claimants, the "***Lien Claimants***").  The value of the product in possession of the Statutory Lien Claimants far outweighs the value of their prepetition claims.  At any given time, a significant portion of the Debtors' inventory and work in progress related to the Massif business is likely to be in the hands of a Lien Claimant. Therefore, in order to continue the business, the Debtors must ensure the release of such product on a timely basis.  Moreover, under the Stalking Horse Agreement relating to Massif, a large portion of the liabilities associated with the Lien Claimants will be assumed and thus this relief will not negatively impact the estates.

105.    The Debtors' Footwear business also is subject to certain Lien Claimants, consisting of the same categories as the Massif business.  However, since the Footwear business manufactures its product, there is less exposure to Lien Claimants.  Nevertheless, the Footwear business also ships goods via third-party carriers, stores goods in warehouses – some of which are leased by Landlords, and has some of its product subject to additional Processors.  In addition, with the Massif business and the Footwear business, many of the Debtors' customers are governmental entities that have strict requirements as to the approval of all parties within the

---

[7]    *See, e.g.*, Cal. Const. Art. XIV § 3 ("Mechanics, materialmen, artisans, and laborers of every class shall have a lien upon the property upon which they have bestowed labor or furnished materials, for the value of such labor done and materials furnished; and the Legislature shall provide by law, for speedy and efficient enforcement of claims.").

supply chain.  Accordingly, if the Debtors do not obtain the delivery of the goods in the Lien Claimants' possession, they may not be able to timely find a replacement producer due to the stringent and lengthy governmental supplier approval process.  Moreover, the governmental entities may be able to exercise rights against the Debtors' receivables that involve contracts separate from any contract that the Debtors' may be unable to complete due to the failure to obtain goods from a Lien Claimant.

106.    Paying amounts owed to the Lien Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  The Possessory Lien Claimants may have liens on the goods in their possession; they may be unwilling to release these goods since this may result in their secured claims against the Debtors becoming unsecured.  Therefore, unless the Debtors are authorized to pay amounts owed to the Possessory Lien Claimants, it is highly unlikely that the Debtors will continue to obtain goods currently in transit or in storage.

107.    Additionally, vendors who are Statutory Lien Claimants hold and may perfect liens on estate property for which goods or services were provided prepetition.  If the Statutory Lien Claimants possess lien rights or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to satisfy amounts owed to Statutory Lien Claimants could have a material adverse impact on the Debtors' business operations.

108.    Under some circumstances, contractual or other rights may permit the Lien Claimants to assert claims for interest during these chapter 11 cases to the extent that their statutory lien rights render their claims oversecured.  Paying such oversecured claims during the course of these chapter 11 cases will benefit the Debtors and their estates by reducing interest expense.  Further, payment of amounts owed to these claimants will eliminate the cost and

potential inefficiency of responding to multiple requests for adequate protection or relief from the automatic stay with respect to such claims.  Finally, payment of amounts owed to the Lien Claimants will not harm unsecured creditors in these chapter 11 cases because the creditors paid will not receive more than they would be entitled to under a plan of reorganization by virtue of their secured status.

109.    Payment of the Lien Claimants is integral to the Debtors' restructuring.  The payments will facilitate the use and/or sale of estate property against which liens may otherwise be asserted, helping to preserve the value of the Debtors' businesses.  Conversely, if the lien claims are not satisfied, the Debtors' may experience a disruption of their business that results in an irrecoverable loss of revenue.  Therefore, the failure to satisfy such prepetition obligations in the ordinary course of business during the first 21-days of these cases will cause significant disruption to the Debtors' operations.

110.    In addition to the Lien Claimant motion, the Debtors have filed a critical vendor motion (as more fully described below).  As the relief requested in these motions has substantial overlap, the Debtors are seeking to utilize any funds remaining under the established caps in the Lien Claimant motion to be utilized in the Critical Vendor motion and vice versa so as to avoid the situation where the Debtors request authority under both motions to address a creditor that will only have, at most, one recovery.

111.    I have reviewed the Lien Claimants Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Lien Claimants Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Lien Claimants Motion should be approved.

m.     **Critical Vendor Motion.**

112.    The Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay the prepetition claims of certain critical vendors in accordance with a Court-approved procurement policy, (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition claims of certain critical vendors and (c) scheduling a final hearing to consider entry of the Final Order.

113.    Specifically, the Debtors seek permission to pay, in their discretion and subject to the terms of the Interim Order, the Final Order and the Procurement Policy, outstanding prepetition amounts to certain vendors and suppliers that, in the Debtors' business judgment, are critical to the Debtors' business operations, as well as those vendors and suppliers that may discontinue (or already have discontinued) providing goods and services to the Debtors absent payment of their prepetition claims (collectively, the "*Critical Vendors*," and the claims of Critical Vendors, the "*Critical Vendor Claims*").  The Debtors' ability to ensure the Critical Vendors continue to provide goods and services is vital to the success of their businesses and overall restructuring efforts.

114.    Payment of any Critical Vendor Claims will be subject – in all respects – to a procurement policy (the "*Procurement Policy*") designed to enable the Debtors to continue to receive goods and services from such vendors on customary trade terms (the "*Customary Trade Terms*") throughout these chapter 11 cases.  The Debtors will endeavor to ensure that the Customary Trade Terms will be no less favorable (from the Debtors' perspective) than those trade terms provided by each Critical Vendor Claimant to the Debtors as of the Petition Date.

**Massif**

115.    In the Massif business, the Debtors design and sell product, but contract with third parties for all of the manufacture of the product.  The Debtors do not take possession of the product until it is finished and in some cases never take possession of the product at all – instead shipping directly from the last finisher involved directly to the customer.  The manufacture of the products in this line will often pass through a number of different parties prior to being completed.  For example, the raw material for the Debtors' product may be shipped via third-party carrier to a manufacturer who largely assembles the goods, then to a finisher or series of finishers who complete the goods, and finally to a warehouse where the goods are stored prior to delivery to a customer.  Along this chain, the Debtors' product makes multiple stops in parties that may add value to the product, it may travel through a number of third-party shippers who would have a possessory lien on the product, and it may be stored by various third parties along the path.

116.    The overwhelming majority of the Massif business is selling products directly or indirectly to governmental entities.  The governmental entities with which the Debtors do business have strict specifications as to the finish product often specifying the component parts that need to be incorporated into the finished product, or specifying the finish product such that only one supplier makes the components that need to be incorporated into the final product.  As such, nearly all of Massif's business is with sole source providers or *de facto* sole source providers.  Accordingly, if one of such sole source providers were to refuse to do business with the Debtors, the Debtors would not be able to realize the sale on the finished products associated with such supplier.

PHIL1 3668561v.8

117.    Moreover, the Debtors generally transact business with their vendors without long term contracts, but instead, pursuant to multiple individual purchase orders.  Accordingly, the Debtors do not have executory contracts with such parties that they could assume.

118.    The Debtors have entered into an asset purchase agreement (the "*Massif APA*") for the sale of the Massif Business.  Pursuant to the Massif APA, a significant portion of the obligations relating to the Critical Vendors of Massif will be assumed, to the extent they are not otherwise satisfied by this motion.  Furthermore, the Massif APA requires the Debtors to maintain the operations in the ordinary course of business with the Critical Vendors whose obligations will be assumed and not delay payments on account of such claims being prepetition claims.  Therefore, the authority requested in this motion is required to allow the Debtors to maintain their obligations under the Massif APA.  Furthermore, the satisfaction of the Critical Vendors relating to Massif at this point will be at minimum cash-neutral to the estates as the satisfaction of those obligations is factored into the purchase price under the Massif APA.  Conversely, without the relief requested herein, the Debtors will not be able to meet their obligations under the Massif APA and will lose the value of such transaction.

**Footwear**

119.    The Debtors Footwear business also sells a majority of its product to governmental entities that specify the exact components and suppliers that must provide the raw materials for the Debtors' products.  The Debtors transact business with these entities generally on a purchase order basis and thus do not have any long-term contracts to assume.  The inability to obtain even a minimal component from the manufacturer specified in the Debtors' contract with a governmental entity may prevent the Debtors from selling the final product.  Accordingly,

the Debtors will frequently need to obtain supplies from sole source, or *de facto* sole source, providers.

120.    The Debtors firmly believe they will benefit their estates by preserving their ability to complete their obligations under the Massif APA.  Furthermore, the Debtors estimate that by utilizing the Procurement Policy, they will obtain liquidity from the Customary Trade Terms that is at least equal to the value of the Critical Vendor Claims that they satisfy.   This liquidity will allow the Debtors to remain within the requirements of the postpetition financing arrangements and will thus allow the Debtors to continue on their restructuring efforts.

121.    I have reviewed the Critical Vendor Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Critical Vendor Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

> **n.**    **Insurance Premium Financing Motion.**

122.    The Debtors request entry of interim and final orders, (a) authorizing, but not directing, the Debtors to (i) continue the Debtors prepetition insurance policies (collectively, and as discussed herein, the "***Insurance Policies***") and renew and/or modify the Insurance Policies (ii) maintain financing of insurance premiums under a prepetition Financing Agreement with Premium Assignment Corporation ("***PAC***"); (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related Insurance Policies; and (c) scheduling a final hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

123.    The Debtors seek interim authority to pay an aggregate amount of approximately $600 in connection with the Insurance Policies that will become due and owing during the first 21 days of these chapter 11 cases.  Pursuant to the Interim Order, the Debtors request authority to (a) continue their prepetition Insurance Policies and renew and/or modify the Insurance Policies and (b) maintain financing of their insurance premiums under the Financing Agreement.

124.    Pursuant to the Final Order, the Debtors seek authority to (a) continue the Insurance Policies, including renewal or modification of the Insurance Policies as necessary in the ordinary course of business, and (b) maintain financing of insurance premiums under the Financing Agreement in the ordinary course of business.

125.    In the ordinary course of business, the Debtors maintain a number of Insurance Policies.  The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets.  In many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities.

126.    The Debtors generally are current on amounts owed to maintain the Insurance Policies.  As of the Petition Date, the Debtors do not believe there are any amounts that are due and owing on the Insurance Policies, with the exception of the Financed Insurance Policy (as defined below).

127.    Certain of the Debtors' insurance policies require payment of the entire premium at inception.  Because it is not always economically advantageous for the Debtors to pay premiums in full up front, the Debtors have financed the premium one of these policies (the "**_Financed Insurance Policy_**") under the Financing Agreement.  The Financed Insurance Policy benefits the Debtors by spreading out the cost of the Insurance Policy over the applicable coverage period.  The Financed Insurance Policy addresses flood insurance.  As of the Petition

-43-

Date, the Debtors owe a total of approximately $2,900 on account of the Financing Agreements. Approximately $400 will come due on account of the Financed Insured Policies within the first 21 days of these chapter 11 cases.

128.    I believe continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**o.    <u>Debtor-In-Possession Financing and Use of Cash Collateral Motion</u>**

129.    The Debtors and their advisors have worked to ensure that upon the commencement of these chapter 11 cases, the Debtors would have in hand a commitment — through debtor in possession financing and authorization to use cash collateral — to provide necessary capital for operational purposes and payment of the administrative costs incurred during the chapter 11 cases.  With this background, the Debtors embarked upon discussions with Wells Fargo and other potential third party providers of financing to procure debtor in possession financing to allow the Debtors' to maximize the value of and sell their assets through two separate sale processes.

130.    Wells Fargo in its capacity as DIP Lender (as defined in the motion) has agreed to allow the Debtors to use Cash Collateral (as defined in the motion) and to provide the Debtors with a $3.5 million senior-secured debtor in possession credit facility, the terms of which the

-44-

Debtors submit are reasonable following extensive arm's-length negotiations. Although the Debtors, through their advisors, searched for alternative financing arrangements, the Debtors were unable to find any alternatives. In the face of this, as well as timing and execution risk associated with any third party financing, the Debtors believe the DIP Facility is the best <u>and only</u> financing available under the circumstances.

131. To implement its proposed sale processes and continue to retain and inspire confidence in its business partners, access to liquidity is critical. The authorization to use Cash Collateral and the DIP Facility will provide liquidity that the Debtors believe is necessary to operations and to conclude the sale processes on an expedited basis. In short, to ensure the Debtors have access to liquidity and inspire confidence in the marketplace in demonstrating the Debtors have the funding and financial support necessary to conclude the successful sales, the Debtors submit the DIP Facility and entry of the DIP Orders (as defined in the motion) is necessary and should be approved.

132. The Debtors request entry of an interim and a final order, authorizing the Debtors to enter into the Debtors-in-Possession Loan and Security Agreement (substantially in the form attached to the motion as **<u>Exhibit B</u>**, the "***DIP Credit Agreement***") and use Cash Collateral.

133. The most significant terms of the DIP Credit Agreement are as follows:

| Provision | Summary Description |
|---|---|
| **Type and Amount of Borrowing** | A senior secured facility in an aggregate principal amount that in no event shall exceed $3,500,000. |
| **Interest Rate**<br><br>DIP Credit Agreement at § 2.3 | Advances under the DIP Facility shall bear interest at 10%. |
| **Default Interest**<br><br>DIP Credit Agreement at §§ 1.1 and 2.8 | The Default Rate shall be a rate per annum that is equal to (i) in the case of the principal amount of the Loans outstanding on such date, 2.0% in excess of the cash interest rate otherwise applicable to such Loan on such date, and (ii) in the case of any other Obligations outstanding on such date, 2.0% in excess of the Prime Rate in effect on such date. |

PHIL1 3668561v.8

| Provision | Summary Description |
|---|---|
| **Fees**<br><br>Interim Order ¶ F. (v) | All costs and expenses (including reasonable legal fees) required to be paid to the DIP Lender in connection with negotiation, preparation and filing and/or recordation of the DIP Facility |
| **Commitment Fee** | None. |
| **Termination Date/Maturity**<br><br>DIP Credit Agreement at § 1.1 | The earliest of (i) the Maturity Date, September 15, 2014, (ii) the date on which Borrower terminates this Agreement and the credit facilities provided hereunder pursuant to Section 2.14 hereof, (iii) the sale of all or substantially all of the assets of the Borrower in one or a series of transactions or (iv) the date on which Bank terminates its obligations to make Advances and other extensions of credit or otherwise accelerates the Obligations as set forth in this Agreement and the Loan Documents. |
| **Events of Default**<br><br>DIP Credit Agreement at § 8.1 | Events of Default customary for financings of this type and other terms deemed appropriate by the DIP Agent and DIP Lender as set forth in the DIP Documents, Interim Order, Final Order or any other similar. |
| **Priority of DIP Facility Liens and Effect on Existing Liens**<br><br>DIP Credit Agreement at § 6.22 | Subject to the Carve-Out, the granting of junior liens on all prepetition assets of the Debtors to the extent such assets are subjected to valid, fully perfected and unavoidable liens in favor of third parties as of the Petition Date pursuant to section 364(c)(3) of the Bankruptcy Code (other than Liens in favor of Prepetition Secured Lender and Subordinated Lender); and valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon on all other prepetition and postpetition assets of the Debtors including those assets securing the Senior Secured Notes pursuant to section 364(d) of the Bankruptcy Code. |
| **Super-priority Administrative Claims**<br><br>Interim Order at ¶ 6 | The claim for repayment of the DIP Obligations under the DIP Financing Agreement, subject only to the Carve-Out have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise and no other superpriority claims shall be granted or allowed in the these chapter 11 cases but for those set forth in the Interim Order. |
| **DIP Budget**<br><br>Interim Order at ¶ Exhibit 1. | The 8-week Budget. |
| **Carve-Out**<br><br>Interim Order at ¶ 37 | The Interim Order provides for a Professional Fee Escrow Account and a Carve-Out for Statutory Fees and Allowed Professional Fees |

| Provision | Summary Description |
|---|---|
| **Milestones**<br><br>DIP Credit Agreement at § 5.17 | Petition Date – July 8, 2014<br><br>File Footwear Sale Motion,<br>Footwear Sale Procedures Motion,<br>Massif Sale Motion and Massif<br>Sale Procedures Motion  – Petition Date<br><br>Footwear & Massif Bidding Procedures Orders – August 5, 2014<br>Footwear & Massif Sale Orders – August 27, 2014<br>Footwear & Massif Closings – September 12, 2014 |

134.    In the face of these chapter 11 cases, absent an ability to demonstrate that the Debtors have the means apart from cash-on-hand available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may choose not to ship goods or provide service to the Debtors, resulting in disruption to the Debtors' supply chain.  Any disruption in the Debtors' supply chain at this critical juncture would cause a severe reduction in the Debtors' cash on hand.

135.    Immediate access to the DIP Facility and the use of cash collateral will enable the Debtors to allay concerns of the Debtors' suppliers and customers and enable the Debtors to carry on with business as usual.  Absent access to liquidity, the Debtors' ability to operate and ultimately sell their assets as a going concern will be jeopardized, all to the detriment of the Debtors' stakeholders.  As a result, the Debtors have an immediate need to secure the DIP Financing to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

136.    The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis.  The DIP Facility was the only available financing under these circumstances.  Indeed, discussions with other potential lenders were stalled because of diligence

-47-

requirements and time constraints or because third-parties were simply uninterested in the costs and risk — as were the Debtors — attendant to a priming fight over the first lien lenders' objection. Accordingly, the Debtors submit that the terms of the DIP Credit Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

137. Immediate and irreparable harm would result if the motion is not granted on an interim basis. As described in detail in the motion, the Debtors have an immediate need to obtain access to incremental liquidity. The Debtors' relationships with their employees, customers and suppliers are paramount to the Debtors' success. The Debtors must be able to communicate to their key stakeholders that they will continue to operate in the ordinary course, satisfy any critical payment obligations and continually satisfy other general working capital and operational needs, and that necessitates access to capital.

138. Accordingly, the Debtors believe that absent access to liquidity under the DIP Facility, the Debtors' vendors may cease to provide goods and services to the Debtors, which would be crippling to the Debtors' businesses. Thus, availability of sufficient working capital and liquidity — and the ability to message to key stakeholders that the funding is available — is imperative to preserve and maintain the value of the Debtors' estates.

139. Accordingly, I believe it is in the best interest of the Debtors and their estates to enter into the DIP Credit Agreement. I have reviewed the motion and hereby attest to the factual assertions contained therein.

In conclusion, for the foregoing reasons and the reasons set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as is appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Declaration.

*/s/ Carlin Adrianopoli*
Carlin Adrianopoli
Chief Restructuring Officer

**<u>Exhibit A</u>**

**Plan Support Agreement**

EXECUTION VERSION

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time, this *"Agreement"*) is made and entered into as of July 7, 2014, by and among: (i) Tactical Intermediate Holdings, Inc.; Tactical Holdings Operations, Inc.; Wellco Enterprises, Inc.; Ro-Search Incorporated; Mo-Ka Shoe Corporation; Altama Delta Corporation; Altama Delta (Puerto Rico) Corporation; Massif Holdings LLC; and Massif Mountain Gear Company LLC, as soon to be debtors and debtors in possession (collectively, the *"Debtors"*) in chapter 11 cases (collectively, the *"Chapter 11 Cases"*) to be commenced in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*) (with the support of Tactical Holdings, Inc., the Debtors' parent, and the Sponsor as defined in the Plan); (ii) Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, as lender (in its capacity as such, together with its permitted successors and assigns, the *"Consenting Senior Secured Lender"*) for that certain Amended and Restated Loan and Security Agreement dated as of July 12, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the *"Prepetition Senior Credit Agreement"*); and (iii) GGC Tactical Debt Holdings, LLC (*"Consenting Subordinated Secured Lender"*) under that certain 12% Secured Promissory Note dated October 12, 2012 (as further amended, modified, waived, or supplemented through the date hereof, the *"Subordinated Note"*). The Consenting Senior Secured Lender, the Consenting Subordinated Secured Lender and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the *"Supporting Parties"* and each a *"Supporting Party."* The Debtors and the Supporting Parties, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are referred herein as the *"Parties"* and individually as a *"Party."*

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the chapter 11 plan of liquidation attached hereto as Exhibit A (the *"Plan"*), which Plan is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein.

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW AND THE PROVISIONS OF THE BANKRUPTCY CODE.**

## RECITALS

**WHEREAS**, the Debtors intend to commence voluntary Chapter 11 Cases in the Bankruptcy Court to effect an orderly sale of their assets and consummate a chapter 11 plan of liquidation (as may be amended or modified in accordance with Section 6 hereof, the *"Plan"*);

**WHEREAS**, the Parties have agreed to support the Plan, which provides for the orderly sale and conversion of all of the Debtors' assets to Cash and the distribution of the net proceeds therefrom to certain creditors holding Allowed Claims, pursuant and subject to the terms and conditions set forth in this Agreement and the Plan;

1

**WHEREAS**, this Agreement and the Plan are the product of arm's-length, good faith discussions and negotiations among the Parties; and

**WHEREAS**, the Debtors and the Supporting Parties are prepared to perform their obligations hereunder subject to the terms and conditions hereof.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    Agreement Effective Date.**

This Agreement shall be effective and binding with respect to each of the Parties at the time at which (a) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Supporting Parties and (b) the Supporting Parties shall have executed and delivered to the Company counterpart signature pages of this Agreement (the "*Effective Date*"). After the Effective Date of this Agreement, the terms and conditions of the Plan and/or this Agreement may only be amended, modified, waived or otherwise supplemented as set forth in Section 6 herein.

**Section 2.    Agreement Controls.**

The Plan is expressly incorporated herein and is made part of this Agreement. The Plan is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the terms of this Agreement and the Plan, this Agreement shall control and govern the subject matter of this Agreement.

**Section 3.    Commitments Regarding the Plan.**

3.01. <u>Commitments of the Supporting Parties</u>. Subject in all respects to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof by or as to a Supporting Party, each such Supporting Party, solely with respect to itself, as applicable, agrees to comply with the following covenants:

(a) each of the Supporting Parties hereby covenants and agrees to support the Plan, including the solicitation, confirmation and consummation of the Plan, as may be applicable, and will not take any actions inconsistent with this Agreement

(b) the Consenting Senior Secured Lender hereby covenants and agrees to (i) timely vote or cause to be voted all claims, as such term is defined in section 101(5) of the Bankruptcy Code (each a "*Claim*" and collectively the "*Claims*") that it holds arising from the Prepetition Senior Credit Agreement to accept the Plan by delivering its duly executed and completed ballot accepting the Plan subject to and upon Bankruptcy Court approval of a disclosure statement and solicitation of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code; and

2

(ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that the vote of the Consenting Senior Secured Lender shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement; and further provided, that the Claims of Wells Fargo Equipment Finance, Inc. shall not be subject to this Agreement;

(c) the Consenting Subordinated Secured Lender hereby covenants and agrees to (i) timely vote or cause to be voted all Claims that it holds, controls, or has the ability to control, to accept the Plan by delivering its duly executed and completed ballot accepting the Plan subject to and upon Bankruptcy Court approval of a disclosure statement and solicitation of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code; and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that the vote of the Consenting Subordinated Secured Lender shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement;

(c) each of the Supporting Parties hereby covenants and agrees (i) not to object to, or vote or cause to be voted (to the extent applicable) any of its Claims that it holds, controls, or has the ability to control, to reject the Plan, or (ii) otherwise commence any proceeding that in any way opposes or has the effect of opposing, hindering or delaying the prosecution of the Plan or object to confirmation thereof; and

(d) each of the Supporting Parties hereby covenants and agrees to not directly or indirectly (i) seek, solicit, support, encourage, or vote or cause to be voted (to the extent applicable) its Claims for, consent to, or encourage any plan, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than the Plan, or (ii) take any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan;

provided, however, that, this Agreement, including the foregoing provisions of this Section 3.01 will not (i) limit the rights of the Supporting Parties to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and/or the terms of the proposed Plan, and, other than as a result of actions or omissions any such Supporting Party takes or does not take in good faith to enforce its rights under this Agreement and/or the terms of the proposed Plan, do not hinder, delay or prevent consummation of the proposed Plan; (ii) prohibit the Supporting Parties from appearing in proceedings for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent with, this Agreement (so long as such appearance is not solely for the purpose of hindering or intending to hinder, the Plan) or for the purpose of taking such action as may be necessary in the reasonable, good faith discretion of such supporting Party to protect such Supporting Party's interests upon such breach; provided, further that the Parties hereby reserve their rights to oppose such relief; provided, further that except as expressly provided herein, this Agreement and all communications and negotiations among the Supporting Parties with respect hereto or any of the transactions contemplated hereunder are without waiver or prejudice to the Supporting Parties' rights and remedies and the Supporting Parties hereby reserve all claims, defenses and positions that they may have with respect to each other and/or the Debtors in the event the Plan is not

3

consummated or this Agreement terminates; and (iii) limit the ability of a Supporting Party to sell or enter into any transactions in connection with the Claims or any other claims against or interests in the Debtors.

3.02.    <u>Agreement of Consenting Senior Secured Lender</u>.  Under no circumstances shall the DIP Lender or the Prepetition Senior Secured Lender be required to pay, nor shall any Sale Proceeds be used to pay, any claim or expense except as funded by and through the DIP Facility or the Administrative Reserve and in amounts not to exceed the amounts specified in the DIP Budget (as may be modified pursuant to the terms of the DIP Order and DIP Credit Agreement). The Consenting Senior Secured Lender shall have no obligation to agree to any amendment or modification of the DIP Budget or the amount of the Administrative Reserve.

3.03    <u>Obligations of the Debtors</u>.

(a)    <u>Affirmative Covenants</u>. Subject in all respects to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors covenant and agree to:

(i) commence the Chapter 11 Cases on or before 8:00 a.m. on July 8, 2014 (the "***Petition Date***");

(ii) file with the Bankruptcy Court the Plan and corresponding disclosure statement (the "***Disclosure Statement***") on the Petition Date, which Plan and Disclosure Statement shall be acceptable to the Supporting Parties;

(iii) (A) support and take all actions reasonably necessary or requested by the Supporting Parties to facilitate the solicitation, confirmation, and consummation of the Plan; (B) not take any action or commence or continue any proceeding that is inconsistent with, or that would delay or impede the solicitation, confirmation, or consummation of the Plan; and (C) support the payment, release, exculpation and injunction provisions set forth in the Plan;

(iv) file with the Bankruptcy Court a motion approving the procedures to implement the Debtors' (x) sale of the flame resistant apparel business assets and (y) sale of the footwear business assets (collectively, the "***Sale Motions***") on the Petition Date, which Sale Motions shall be acceptable to the Supporting Parties, and distributed to the respective legal and financial advisors for the Supporting Parties so as to afford reasonable opportunity to comment and review in advance of any filing thereof;

(v) seek hearings for approval of the bidding procedures in connection with the Sale Motions to be heard on August 5, 2014;

(vi) seek hearings for approval of the Sale Motions by no later than August 27, 2014;

(vii)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases; or (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; and

(viii) if the Debtors know or should know of a breach by any Debtor in any respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Supporting Parties.

(b)    Negative Covenants. Subject to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors shall not, directly or indirectly, permit to occur any of the following:

(i) modify the Plan, in whole or in part, in a manner that is inconsistent with the terms of the Plan or the terms of this Agreement;

(ii) take any action that is inconsistent with this Agreement, or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan;

(iii) withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan; or

(iv) take any action challenging the amount and/or validity of the Consenting Senior Secured Lender's or the Consenting Subordinated Secured Lender Claims.

Notwithstanding anything in this Section 3.02, nothing in this Agreement shall prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or not take, as the case may be) in the performance of any fiduciary duty or as otherwise required by applicable law which such Debtor owes to any other person or entity under applicable law, provided, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Sections 5.01 and 5.03 hereto. Each of the Debtors represents to the Supporting Parties (without giving consideration or effect to the immediately preceding sentence) that as of the Effective Date of this Agreement, based on the facts and circumstances actually known by the Debtors as of the Effective Date of this Agreement, the Debtors' entry into this Agreement is consistent with all of the fiduciary duties of each of the Debtors.

3.04. Definitive Documents.

Each Party hereby covenants and agrees, severally and not jointly, to (a) negotiate in good faith each of the documents implementing, achieving and relating to the Plan, including without limitation, (i) the Plan Supplement and (ii) the proposed order approving and confirming the Plan (the "*Confirmation Order*") (collectively, the "*Definitive Documents*"), which

5

Definitive Documents shall contain terms and conditions consistent in all respects with the Plan and this Agreement, and (b) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents; provided, however, Consenting Senior Secured Lender shall have no obligation to agree to any modification or amendment of the DIP Budget or any increase in the amount of the Administrative Reserve. All Parties shall have the right to review and comment on the Definitive Documents, and such Definitive Documents shall be acceptable to the Parties in form and substance prior to filing with the Bankruptcy Court.

**Section 4.    Representations and Warranties.**

4.01.   Mutual Representations and Warranties. Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party (to the extent applicable), as of the Effective Date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

(a)    It is validly existing and in good standing under the laws of the state or other jurisdiction of its organization, and this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)    Except as expressly provided in this Agreement, it has all requisite direct or indirect power and authority to enter into this Agreement and to carry out the Plan contemplated by, and perform its respective obligations under, this Agreement;

(c)    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and no consent, approval or action of, filing with or notice to any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement; and

(d)    It has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

**Section 5.    Termination Events.**

5.01.   Supporting Party Termination Events. Any Supporting Party may terminate its obligations and liabilities under this Agreement upon three (3) business days' prior written notice, delivered in accordance with Section 8.14 hereof, at any time prior to confirmation of the Plan following the occurrence and continuation of any of the following events (each, a "***Supporting Party Termination Event***"):

(a)    The Debtors do not commence the Chapter 11 Cases on or before 8:00 a.m. on July 8, 2014;

(b)     the Debtors do not file the Plan, and corresponding Disclosure Statement (the "**_Disclosure Statement_**") on the Petition Date, which Plan and Disclosure Statement shall be acceptable to the Supporting Parties;

(c)     the Debtors do not file the Sale Motions on the Petition Date;

(d)     the Bankruptcy Court (i) denies approval of the Interim DIP Order or (ii) fails to enter the Interim DIP Order (in form and substance reasonably acceptable to Prepetition Senior Secured Lender and Consenting Subordinated Secured Lender) within three (3) Business Days of the Petition Date;

(e)     the Bankruptcy Court (i) denies approval of the Final DIP Order or (ii) fails to enter the Final DIP Order (in form and substance reasonably acceptable to Prepetition Senior Secured Lender and Consenting Subordinated Secured Lender) within thirty (30) Business Days of the Petition Date;

(f)     the DIP Facility Credit Agreement ceases to be valid and binding on the Debtors for any reason;

(g)     an order is entered that modifies or vacates the DIP Order without the consent of DIP Lender;

(h)     the DIP Lender's obligation to make advances under the DIP Facility terminates and the DIP Lender commences the exercise of its remedies for default under the DIP Facility Credit Agreement or the DIP Order;

(i)     the Debtors' authority to use Cash Collateral of Prepetition Senior Secured Lender pursuant to the DIP Order terminates and the Prepetition Senior Secured Lender exercises its remedies under the Prepetition Senior Secured Credit Facility or DIP Order;

(j)     the Massif Asset Purchase Agreement is (i) terminated for any reason, or (ii) modified in any material respect without the consent of the Prepetition Senior Secured Lender ;

(k)     Debtors waive any material right under the Massif Asset Purchase Agreement without the consent of the Prepetition Senior Secured Lender;

(l)     the Bankruptcy Court (i) denies approval of the bidding procedures in connection with the either of the Sale Motions, or (ii) fails to enter orders approving either or both of the bidding procedures with respect to the Sale Motion on or before August 5, 2014;

(m)     the Bankruptcy Court (i) denies approval of either or both of the Sale Motions, or (ii) fails to enter orders approving either or both of the Sale Motions on or before August 27, 2014, in each case in form and substance acceptable to Prepetition Senior Secured Lender;

(n)    the Debtors fail to close on the sale under the Massif Sale Motion on or before September 12, 2014 based on a Cash sale price of not less than $8,000,000, or for a Cash sale price and terms otherwise acceptable to Prepetition Senior Secured Lender;

(o)    the Debtors fail to close on the sale under the Footwear Sale Motion on or before September 12, 2014;

(p)    the Debtors seek to modify the Plan without the consent of the each of the Supporting Parties;

(q)    the Debtors seek to obtain any financing or use of cash collateral other than the DIP Facility provided by Prepetition Senior Secured Lender;

(r)    the Bankruptcy Court (i) denies approval of the Disclosure Statement or (ii) fails to enter an order approving the Disclosure Statement on or before September 30, 2014; *provided, however*, that the Debtors may extend such date by up to 14 days with the consent of the Consenting Senior Secured Lender and Consenting Subordinated Secured Lender;

(s)    the Bankruptcy Court (i) denies confirmation of the Plan or (ii) fails to enter the Confirmation Order approving the Plan on or before October 31, 2014;

(t)    the First Distribution Date shall not have occurred on or before November 15, 2014;

(u)    any party in the Chapter 11 Cases, including, but not limited to, any official committee of unsecured creditors appointed in the Chapter 11 Cases, seeks and obtains an order granting standing, or the Debtors concede standing, to challenge the amount and/or validity of either the Consenting Senior Secured Lender's Claim or the Consenting Subordinated Secured Lender's Claim;

(v)    any party in the Chapter 11 Cases, including, but not limited to, any official committee of unsecured creditors appointed in the Chapter 11 Cases, seeks and obtains an order granting standing, or the Debtors concede standing, to commence an action against either the Consenting Senior Secured Lender or the Consenting Subordinated Secured Lender seeking transfer or lien avoidance, equitable subordination, debt recharacterization or other equitable challenge to the Consenting Senior Secured Lender's Claim or the Consenting Subordinated Secured Lender's Claim;

(w)    the breach or noncompliance in any respect by any of the Debtors or Supporting Parties of (or failure to satisfy) any of the obligations, representations, warranties, or covenants of such Party set forth in this Agreement (including, without limitation, in Section 3.01, 3.02, 3.03 and 3.04 hereto) that remains uncured for five (5) days after the receipt by the breaching Party of written notice of such breach, but solely to the extent such breach or noncompliance is materially adverse to such Supporting Party or materially affects the ability of the Debtors or the Supporting Parties from consummating the transactions contemplated herein;

8

(x)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtors or would have a material adverse effect on consummation of the Plan;

(y)    the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(z)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; and

(aa)    exercise by any of the Debtors of its "fiduciary out" as debtors-in-possession as provided for in Section 3.03 and 8.13 of this Agreement.

5.02.    <u>Debtor Termination Events</u>. The Debtors may terminate their obligations and liabilities under this Agreement upon three (3) days prior written notice delivered to the Parties in accordance with Section 8.14 hereof, upon the occurrence of any of the following events (each, a "***Debtor Termination Event***" and together with the Supporting Party Termination Events, the "***Termination Events***," and each a "***Termination Event***"):

(a)    the material breach by any of the Supporting Parties of any of the obligations, representations, warranties, or covenants of such Supporting Parties set forth in this Agreement that would have a material adverse impact on the consummation of the Plan (taken as a whole) that remains uncured for a period of five days after the receipt by the breaching Supporting Parties of written notice of such breach from the Debtors;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Plan (taken as a whole); or

(c)    any one or more of the Debtors' determination that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of their fiduciary duties.

5.03.    <u>Effect of Termination</u>.

(a)    Upon any termination of this Agreement by any Party under Section 5.01 or 5.02, (i) this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and the Plan, including without limitation, any obligation of the terminating Supporting Party, to support, consent, vote for, agree to or not object to any provision in the Plan, to waive, release, or limit any of such Supporting Party's Claims against the Debtors or any other entity or person, and shall have the rights and remedies that it would have had it not entered into this Agreement, and

shall be entitled to take all actions, whether with respect to the Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (ii) any and all consents and ballots tendered by the Supporting Parties prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission). Notwithstanding the foregoing, any claim for breach of this Agreement that accrued prior to the date of a Party's termination or termination of this Agreement (as the case may be) and all rights and remedies of the Parties hereto shall not be prejudiced as a result of termination.

(b)    Notwithstanding any provision in this Agreement to the contrary, no Party shall terminate this Agreement if such party (in any capacity that is Party to this Agreement) is in breach of any provision hereof.

(c)    Notwithstanding any provision in this Agreement to the contrary, the non-breaching Supporting Parties and the Debtors may each agree to continue to be bound by the terms of this Agreement notwithstanding such breach.

5.04.  Termination Upon Consummation of the Plan. This Agreement shall terminate automatically without any further required action or notice upon the consummation of the Plan.

## Section 6.    Amendments.

This Agreement, the Plan, the Definitive Documents or any annexes thereto may not be modified, amended or supplemented, nor may any terms and conditions hereof or thereof be waived, without the prior written consent of the Debtors and each of the Supporting Parties.

## Section 7.    No Solicitation.

Notwithstanding anything to the contrary herein, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale, exchange, hypothecation or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended.

## Section 8.    Miscellaneous.

8.01.  Obligations of the Consenting Senior Secured Lender. Notwithstanding anything to the contrary contained herein, from and after the indefeasible payment in full in Cash of the Allowed Consenting Senior Secured Lender Claims, the Consenting Senior Secured Lender shall no longer be bound by the terms of this Agreement and such terms of this Agreement shall be of no further force or effect solely with respect to the Consenting Senior Secured Lender.

8.02.   Claim Resolution Matters. Prior to the entry of the Confirmation Order and the Effective Date under the Plan, the Debtors shall not enter into any agreements with holders of Claims relating to the allowance, estimation, validity, extent or priority of such Claims, or the treatment and classification of such Claims under the Plan, without the prior written consent of the Consenting Senior Secured Lender and Consenting Subordinated Secured Lender, except with respect to Claims which the Company is authorized to resolve or pay pursuant to any applicable first day orders.

8.03.   Cooperation. The Debtors shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court to counsel for the Supporting Parties as soon as reasonably practicable but not less than two (2) days prior to the date when the Debtors intends to file each such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. The Debtors will provide draft copies of all other substantive or procedural motions and applications the Debtors intend to file with the Bankruptcy Court to counsel for the Supporting Parties within a reasonable time prior to filing any such pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

8.04.   Access. Subject to the terms of the DIP Credit Agreement, the Debtors will afford the Supporting Parties and their attorneys, consultants, accountants and other authorized representatives access to all properties, books, contracts, commitments, records, management personnel, lenders and advisors of the Debtors.

8.05.   Further Assurances. Subject to the other terms hereof, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Plan in accordance with this Agreement.

8.06.   Complete Agreement. This Agreement, exhibits and the annexes hereto, including the Plan, represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto. No claim of waiver, consent, or acquiescence with respect to any provision of this Agreement, exhibits and annexes hereto shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

8.07.   Parties. This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity. Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

8.08.   Headings. The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11

8.09.    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the United States District Court for the Southern District of New York, and by execution and delivery of this Plan Support Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY HERE IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS RESTRUCTURING SUPPORT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Notwithstanding the foregoing consent to New York jurisdiction, after the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Plan Support Agreement.

8.10.    Execution of Agreement. This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8.11.    Interpretation. This Agreement is the product of negotiations between the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

8.12.    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

8.13.    Acknowledgements. Notwithstanding anything herein to the contrary, (a) this Agreement shall not be construed to limit the Debtors or any member of the Debtors' boards of directors' exercise (in their sole discretion) of their fiduciary duties to any person or entities, including but not limited to those arising from the Debtors' status as a debtor or debtor in possession under the Bankruptcy Code or under other applicable law, and (b) none of the Supporting Parties shall (i) have any fiduciary duty or (ii) other duties or responsibilities to each other, the Debtors or any of the Debtors' creditors or other stakeholders.

8.14.    Notices. All notices hereunder shall be deemed given if in writing and delivered, if sent by hand delivery, electronic mail, courier, or overnight delivery (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to the Debtors, to:

       Klehr Harrison Harvey Branzburg LLP
       919 N. Market Street, Suite 1000
       Wilmington, DE 19801
       Attn: Domenic E. Pacitti

(b)     if to the Consenting Senior Secured Lender to:

       Winston & Strawn LLP
       100 North Tryon Street
       Charlotte, NC 28202-1078
       Attn: Felton E. Parrish

(c)     if to the Consenting Subordinated Secured Lender, to:

       Kirkland & Ellis LLP
       601 Lexington Avenue
       New York, New York 10022
       Attn: Joshua A. Sussberg
       E-mail address: jsussberg@kirkland.com

Any notice given by hand delivery, electronic mail, mail, or courier shall be effective when received.

8.15.   _Waiver_. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Supporting Party or the ability of each of the Supporting Parties to protect and preserve its rights, remedies and interests, including, without limitation, its Claims against or interests in the Debtors. If the Plan is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.16.   _Several, Not Joint, Obligations_. The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint. It is understood and agreed that any Supporting Party, to the extent applicable, may trade in its Claims or other debt or equity securities of the Debtors without the consent of the Debtors, subject to applicable law.

8.17.   _Remedies_. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

13

8.18.   Specific Performance. This Agreement is intended as a binding commitment enforceable in accordance with its terms against the Parties. It is understood and agreed by each of the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled solely to specific performance and injunctive or other equitable relief as a remedy of any such breach.

8.19.   No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

8.20.   Automatic Stay. The Parties acknowledge that the giving of notice or termination by any Party pursuant to this Agreement shall not be violation of the automatic stay of section 362 of the Bankruptcy Code.

8.21.   Survival of Agreement. Each of the Parties acknowledges and agrees that (a) the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court, and (b) the Debtors waive any rights to assert that the exercise of such rights violate the automatic stay, or any other provisions of the Bankruptcy Code.

8.22.   Settlement Discussions. This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

8.23.   Consideration. The Parties hereby acknowledge that no consideration, other than that specifically described herein, the Plan and the Definitive Documents shall be due or paid to any Party for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement.

[Signatures on Following Page]

14

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their respective and duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the day first set forth above.

**Tactical Intermediate Holdings, Inc.; Tactical Holdings Operations, Inc.; Wellco Enterprises, Inc.; Ro-Search Incorporated; Mo-Ka Shoe Corporation; Altama Delta Corporation; Altama Delta (Puerto Rico) Corporation; Massif Holdings LLC; and Massif Mountain Gear Company LLC**

By: _____
Name: Shishir Babu
Title: Chief Executive Officer

**Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, as lender**

By: _____
Name: _____
Title: _____

**GGC Tactical Debt Holdings, LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective and duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the day first set forth above.

Tactical Intermediate Holdings, Inc.; Tactical Holdings Operations, Inc.; Wellco Enterprises, Inc.; Ro-Search Incorporated; Mo-Ka Shoe Corporation; Altama Delta Corporation; Altama Delta (Puerto Rico) Corporation; Massif Holdings LLC; and Massif Mountain Gear Company LLC

By: _____
Name: _____
Title: _____

Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, as lender

By: _____
Name: _Theed Maynard_
Title: _Senior Vice President_

GGC Tactical Debt Holdings, LLC

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective and duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the day first set forth above.

**Tactical Intermediate Holdings, Inc.; Tactical Holdings Operations, Inc.; Wellco Enterprises, Inc.; Ro-Search Incorporated; Mo-Ka Shoe Corporation; Altama Delta Corporation; Altama Delta (Puerto Rico) Corporation; Massif Holdings LLC; and Massif Mountain Gear Company LLC**

By: _____

Name: _____

Title: _____

**Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, as lender**

By: _____

Name: _____

Title: _____

**GGC Tactical Debt Holdings, LLC**

By: _____

Name: _____

Title: _____

# Exhibit A

**Chapter 11 Plan of Liquidation of Tactical Intermediate Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TACTICAL INTERMEDIATE | ) | |
| HOLDINGS, INC., *et al.*,[1] | ) | Case No. 14-11659 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## CHAPTER 11 PLAN OF LIQUIDATION OF
## TACTICAL INTERMEDIATE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

### JULY 8, 2014

KLEHR HARRISON HARVEY
BRANZBURG LLP

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile:  (302) 426-9193
Email:     dpacitti@klehr.com
Email:     myurkewicz@klehr.com

KLEHR HARRISON HARVEY
BRANZBURG LLP

Morton R. Branzburg *(pro hac vice pending)*
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Facsimile:  (215) 568-6603
Email:     mbranzburg@klehr.com


*Proposed Counsel for the Debtors
and Debtors-in-Possession*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Tactical Intermediate Holdings, Inc. (4895); Tactical Holdings Operations, Inc. (8504); Wellco Enterprises, Inc. (9274); Ro-Search Incorporated (6293); Mo-Ka Shoe Corporation (2446); Altama Delta Corporation (6369); Altama Delta (Puerto Rico) Corporation (3459); Massif Holdings LLC (1692); and Massif Mountain Gear Company LLC (9717).  The address of the Debtors' corporate headquarters is 5968 Commerce Blvd., Morristown, TN 37814.

## INTRODUCTION

Tactical Intermediate Holdings, Inc., Tactical Holdings Operations, Inc., Wellco Enterprises, Inc., Ro-Search Incorporated, Mo-Ka Shoe Corporation, Altama Delta Corporation, Altama Delta (Puerto Rico) Corporation, Massif Holdings LLC, and Massif Mountain Gear Company LLC (collectively, the **"Debtors"**), as debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby propose the following chapter 11 plan of liquidation pursuant to the provisions of chapter 11 of the Bankruptcy Code.

For a discussion of the Debtors' history, businesses, properties, key contracts, and a summary and analysis of the Plan, stakeholders of the Debtors should review the Disclosure Statement filed with the Bankruptcy Court to which the Plan is attached. ALL CLAIMHOLDERS AND INTERESTHOLDERS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The Plan provides for the liquidation and conversion of all of the Debtors' remaining assets to Cash and the distribution of the net proceeds realized therefrom to creditors holding Allowed Claims as of the Record Date in accordance with the relative priorities established in the Bankruptcy Code. The Plan does not provide for a distribution to Interestholders, and their votes are not being solicited. The Plan contemplates the appointment of a Plan Administrator to, among other things, resolve Disputed Claims, pursue any unreleased causes of action, implement the terms of the Plan and make Distributions.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from a Claimholder until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Claimholders.

The Debtors expressly reserve their right to alter, amend or modify the Plan, one or more times, before its substantial consummation, subject to the consent of the Prepetition Senior Secured Lender (as defined below) and the Secured Noteholder (as defined below) and the restrictions on modification set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and otherwise set forth in this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE BANKRUPTCY COURT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCE OR REJECTION OF THE PLAN.

# ARTICLE I

## A.    Scope of Definitions

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Article 1 of the Plan.  Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

## B.    Definitions

1.1    ***"Additional Recoveries"*** means (i) all Net Recoveries of the liquidation of the Debtors' Assets from any source, but excluding any Sale Proceeds and (ii) the balance of any Sale Proceeds after payment in full of the DIP Facility Claim and the Prepetition Senior Secured Claim.

1.2    ***"Administrative Claim"*** means a claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Claims, and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

1.3    ***"Administrative Reserve"*** means a reserve in the amount of $250,000 established for payment of incurred and anticipated reasonable and necessary expenses of administering and winding down the Chapter 11 Cases following the sales of the Massif Assets and the Footwear Assets, which amount shall be funded solely from Cash Sale Proceeds of the sale of the Massif Assets at the closing thereof, and which funds shall continue to be Cash Collateral subject to the cash collateral terms and provisions of the DIP Order.

1.4    ***"Administrative Tax Claim"*** means a claim for any tax of a kind specified in section 503(b)(1)(B) and (C) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

1.5    ***"Allowed Claim" and "Allowed Interest"*** mean a Claim or Interest or any portion thereof (a) that has been allowed by a Final Order, or (b) as to which, on or by the Effective Date, (i) no proof of claim has been filed with the Bankruptcy Court and (ii) the liquidated and noncontingent amount of which is Scheduled, other than a Claim or Interest that is Scheduled in an unknown amount or as disputed, or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (d) that is

3

expressly allowed in a liquidated amount in the Plan.  The amount of an Allowed Claim or Allowed Interest shall be the lesser of the amount stated in a proof of claim filed for such Claim or Interest (if less than the amount Scheduled for such Claim or Interest), the amount agreed to in a written settlement, or the amount allowed by a Final Order.  All distributions on account of an Allowed Claim or Allowed Interest will be made to the Claimholder or Interestholder of record on the Record Date.

   1.6  *"Allowed [ ] Claim"* and *"Allowed [ ] Interest"* means an Allowed Claim or Allowed Interest of the type described.

   1.7  *"Assets"* means all of the right, title and interest of the Debtors in and to property of whatever type or nature (real, personal, mixed, tangible or intangible), including property of each Debtors' Estate.

   1.8  *"Avoidance Actions"* means, unless otherwise released under a prior Order of the Bankruptcy Court or under the Plan, Causes of Action against Persons arising under sections 502, 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Avoidance Actions.

   1.9  *"B Holders"* Means Jeffrey K. Roberts, Christopher Wasgatt, Randy Benham and Christopher A. Amen, as Trustee of the Christine A. Amend Living Trust.

   1.10  *"Ballot"* means each of the ballot forms that are distributed with the Disclosure Statement to Claimholders with Claims in Classes that are impaired under the Plan and entitled to vote under Article IV hereof in connection with the solicitation of acceptances of the Plan.

   1.11  *"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

   1.12  *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Cases.

   1.13  *"Bankruptcy Rules"* means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, (b) the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and (c) the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

   1.14  *"Bar Date"* means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be filed.

   1.15  *"Business Day"* means any day, excluding Saturdays, Sundays and legal holidays, on which commercial banks are open for business in Wilmington, Delaware.

   1.16  *"Cash"* means currency, a certified check, cashier's check or wire transfer of good funds from any source.

4

1.17        *"Cash Collateral"* has the meaning assigned to such term in section 363(a) of the Bankruptcy Code.

1.18        *"Causes of Action"* means, unless otherwise released under a prior Order of the Bankruptcy Court or under the Plan, any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.19        *"Chapter 11 Cases"* means the Debtors' bankruptcy cases pending in the Bankruptcy Court and being jointly administered with one another as case numbers [_____] and *"Chapter 11 Case"* means any one of the Chapter 11 Cases.

1.20        *"Claim"* means a claim against any one of the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

1.21        *"Claims Agent"* means Prime Clerk, LLC, the claims and noticing agent of the Debtors.

1.22        *"Claimholder"* means a holder of a Claim.

1.23        *"Class"* means a category of Claimholders or Interestholders described in Article III of the Plan.

1.24        *"Confirmation Date"* means the date of entry of the Confirmation Order.

1.25        *"Confirmation Hearing"* means the hearing before the Bankruptcy Court on confirmation of the Plan and related matters under section 1128 of the Bankruptcy Code.

1.26        *"Confirmation Hearing Notice"* means the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the Confirmation Hearing and the time for filing objections to the confirmation of the Plan.

1.27        *"Confirmation Order"* means the order entered by the Bankruptcy Court confirming in all respects all of the provisions, terms and conditions of this Plan.

1.28        *"Creditors' Committee"* means the Official Committee of Unsecured Creditors consisting of the Persons appointed to such Committee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code and their appointed successors.

1.29        *"Cure"* means with respect to the assumption and assignment of an executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code, (a) the distribution of Cash by the Debtors at or before the closing of the Asset Sale, or (b) payment of Cash by the assignee, in an amount equal to all due and payable unpaid monetary obligations, without interest, under such executory contract or unexpired lease, or such other amount as may

5

be agreed upon by the parties to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

1.30     *"Debtors"* shall have the meaning ascribed thereto in the Introduction.

1.31     *"Deficiency Claim"* means, as to a Secured Creditor, that portion of such Secured Creditor's Allowed Secured Claim not paid or satisfied from the proceeds of any sale or other disposition of the Debtors' assets or return of such Secured Creditor's collateral; and, as to any other creditor asserting a claim that is subject to a lien or security interest in property of the Estates, such Claim to the extent it is (a) rendered an unsecured claim by virtue of section 506(a) of the Bankruptcy Code and (b) otherwise determined to be an Allowed Claim.

1.32     "*DIP Budget*" means the Approved Budget attached as Exhibit A to the DIP Facility Credit Agreement.

1.33     "*DIP Facility*" means that senior secured superpriority debtor-in-possession credit facility.

1.34     "*DIP Facility Claim*" means any Claim derived from, or based upon, relating to, or arising from, the DIP Facility Credit Agreement.

1.35     "*DIP Facility Credit Agreement*" means the agreement governing the DIP Facility, date as of July 8, 2014 among the Debtors and the DIP Lender (as amended, restated, supplemented or otherwise modified from time to time), as well as any other documents entered into in connection therewith.

1.36     "*DIP Lender*" means Wells Fargo Bank, National Association, together with its successors and assigns.

1.37     "*DIP Order*" means any interim order (or orders) and the final order of the Bankruptcy Court, authorizing, *inter alia*, the Debtors to enter into the DIP Facility Credit Agreement and incur the postpetition obligations thereunder.

1.38     *"Disallowed Claim"* means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order or (b) is Scheduled at zero or as contingent, disputed or unliquidated and as to which a proof of claim bar date has been established, but no proof of claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.39     *"Disclosure Statement"* means the written disclosure statement that relates to the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time.

1.40     *"Disclosure Statement Approval Order"* means a Final Order approving, among other things, the Disclosure Statement.

6

1.41    **"Disputed Claim"** means a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, and includes, without limitation, a Claim that (a) has not been Scheduled or is Scheduled by the Debtors as unknown or as contingent, unliquidated or disputed for which a proof of claim has been filed or (b) is the subject of an objection filed with the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

1.42    "**Distribution Dates**" means collectively, the First Distribution Date, any Subsequent Distribution Date and the Final Distribution Date..

1.43    "**Distribution Record Date**" or "**Record Date**" means the date that is two (2) Business Days after the entry of an order by the Bankruptcy Court approving the Disclosure Statement.

1.44    **"Distribution Reserve"** means Cash from the Plan Administrator  in an amount equal to the distribution or distributions under applicable classes of Claims that shall be made on account of Disputed Claims when allowed, which Cash will be held by Plan Administrator  pending allowance of Disputed Claims, and then distributed on account of Allowed Claims in accordance with Section 8.6(a) of the Plan.  The Distribution Reserve shall be funded solely from the Plan Assets.

1.45    **"Effective Date"** means the first Business Day on which the conditions precedent set forth in Sections 10.2 of this Plan have been satisfied or waived as provided in Section 10.3 hereof.

1.46    **"Estates"** means as to each Debtor the bankruptcy estate of the Debtor arising pursuant to section 541 of the Bankruptcy Code.

1.47    "**Exculpated Claim**"  means any Claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, including the negotiation, formulation, preparation or performance of the DIP Loan Facility, the Plan Support Agreement, the liquidation of assets, formulation, preparation, dissemination, negotiation, filing, confirmation, approval, implementation or administration of the Disclosure Statement, the Plan (including any term sheets related thereto), the property to be distributed under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation and Consummation and the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement.

1.48    "**Exculpated Party**" means each of: (a) the Debtors; (b) the DIP Lender; (c) the Prepetition Senior Secured Lender; (e) the Secured Noteholder; (f) the Sponsor; (g) the Creditors Committee and with respect to clauses (a) through (g) such entities' predecessors, successors and assigns, subsidiaries, affiliates, beneficial owners, managed accounts or funds, current and former officers, directors, principals, shareholders, direct and indirect equity holders, members, partners (general and limited), employees, agents, advisory board members, financial

7

advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

1.49      *"Exhibit"* means an exhibit annexed to the Plan.

1.50      *"Face Amount"* means (a) when used in reference to a Disputed or Disallowed Claim, the full stated amount claimed by the Claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

1.51      *"Final Distribution Date"* means the date(s) on which a final Distribution of Plan Assets to Holders of Allowed Claims entitled to Distributions therefrom. The Final Distribution Date(s) shall be one or more dates, as determined by the Plan Administrator, with the consent of the Prepetition Senior Secured Lender and the Secured Noteholders, which is after the liquidation into Cash of all Plan Assets of the Debtors (other than those assets abandoned by the Debtors or the Plan Administrator, as applicable) and the collection of other sums due or otherwise remitted or returned to the Estates.

1.52      *"Final Distribution Report"* shall have the meaning set forth in Section 8.11 of the Plan.

1.53      *"Final Order"* means an order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

1.54      *"First Distribution Date"* means with respect to a Claim that is Allowed as of the Effective Date, the Effective Date or the date that is as soon as reasonably practicable after the Effective Date.

1.55      *"Footwear Assets"* means substantially all of the assets of all Debtors other than Massif Mountain Gear Company, L.L.C.

1.56      *"Footwear Sale Motion"* means, the Debtors' Combined Motion for Orders (A)(I) Approving Bidding Procedures in connection with the Sale of Substantially All Their Footwear Assets by Public Auction; (II) Scheduling a Hearing to Consider the Sale of the Footwear Assets; and (III) Approving the Form and Manner of Notices Thereof; (B)(I) Authorizing and Approving the Sale of Footwear Assets Free and Clear of Liens, Claims, Encumbrances and Interests; and (II) Approving the Assumption and Assignment of Potential Designated Certain Executory Contracts and Unexpired Leases; and (C) Granting Other Relief, filed on July 8, 2014.

1.57      *"Footwear Sale Order"* means any order or orders of the Bankruptcy Court approving the sale of the Footwear Assets pursuant to Footwear Sale Motion.

8

1.58 *"General Unsecured Claim"* means a Claim that is not an Administrative Claim, Priority Claim, Secured Claim or Miscellaneous Secured Claim, and specifically includes, without limitation, any unsecured Deficiency Claim of any holder of a Miscellaneous Secured Claim, the unsecured Deficiency Claim of the Prepetition Senior Secured Lender and the unsecured Deficiency Claim of the Secured Noteholder.

1.59 *"Holdback Amount"* means the amount estimated by the Debtors funded solely from the Professional Fee Escrow Account to be used to pay the Allowed Professional Claims of a Professional Person retained by the Debtors or Creditors' Committee and the Claims Agent.

1.60 *"Holdback Escrow Account"* means the escrow account established by the Debtors into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims that are subject to the Professional Fee Escrow Account and the Claims Agent to the extent not previously paid or disallowed.

1.61 *"Impaired"* refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.62 *"Interest"* means the rights of any current or former holder or owner of any shares of common stock, preferred stock or any other equity securities of the Debtors authorized and issued prior to the Confirmation Date, exclusive of any such interests held in treasury by the Debtors, and the rights of any member of the limited liability company Debtors.

1.63 *"Interestholder"* means a holder of an Interest.

1.64 *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended.

1.65 *"Massif Asset Purchase Agreement"* means (i) that certain Asset Purchase Agreement for the sale of the Massif Assets dated as of July 3, 2014 by and between Massif Apparel Enterprises, LLC, a Delaware limited liability company, as purchaser, and Debtor Massif Mountain Gear Company, L.L.C., an Oregon limited liability company, as seller, as the same may amended from time to time, or (ii) any alternative Asset Purchase Agreement for the sale of the Massif Assets that is executed by the successful bidder for the Massif Assets pursuant to the bidding procedures approved by the Bankruptcy Court in connection with the Massif Sale Motion.

1.66 *"Massif Assets"* means substantially all assets of Massif Mountain Gear Company, L.L.C.

1.67 *"Massif Sale Motion"* means, the Debtors' Motion for Order (A) Approving Sale Procedures and Bidding Protections in connection with the Massif Asset Purchase Agreement Pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of Certain of the Debtors' Assets' (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Asset Purchase Agreement and Sale of Certain of the Debtor's Assets, and

9

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Establishing Procedures for Noticing and Determining Cure Amounts; and (E) Granting Other Relief, filed on July 8, 2014.

1.68    ***"Massif Sale Order"*** means any order or orders of the Bankruptcy Court approving the sale of the Massif Assets pursuant to Massif Sale Motion.

1.69    ***"Miscellaneous Secured Claim"*** means any Secured Claim other than the DIP Facility Claim, the Prepetition Senior Secured Claim, and the Secured Claim of the Secured Noteholder, whether by operation of law, contract or otherwise, but solely to the extent of the value, as of the Effective Date, or such other date as is established by the Bankruptcy Court, of such security interest or lien after giving effect to all security interests or liens senior in priority

1.70    ***"Net Recoveries"*** shall mean the net proceeds of the liquidation of the Assets of the Debtors after payment of all necessary and actual fees and expenses associated with the liquidation of such Assets.

1.71    ***"Non-Debtor Parent"*** means Tactical Holdings, Inc.

1.72    ***"Person"*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

1.73    ***"Petition Date"*** means, as to each Debtor, July 8, 2014, which is the date on which each Debtor filed its petition commencing its Chapter 11 Case.

1.74    ***"Plan"*** means the plan which is herein jointly proposed by the Debtors, as consolidated entities, for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as such plan may be amended or modified from time to time in accordance with the Bankruptcy Code and subject to consent of the Prepetition Senior Secured Lender and the Secured Noteholder.

1.75    ***"Plan Administrator"*** means [•] and any successor appointed by the Prepetition Senior Secured Lender and Secured Noteholder pursuant to the Plan Administrator Agreement.

1.76    ***"Plan Administrator Agreement"*** means the agreement, established as of the Effective Date setting forth the terms and conditions of the Plan Administrator, in substantially the form to be attached hereto as Exhibit A and filed with the Plan Supplement.

1.77    ***"Plan Administrator Expense Reserve"*** shall mean the amount, determined from time to time by the Plan Administrator, that the Plan Administrator estimates will be required to perform his duties and pay expenses in accordance with the Plan and the Plan Administrator Agreement, including the fees and expenses of the professionals retained by the Plan Administrator, the cost to obtain and maintain any kind of insurance or indemnity policy for the Plan Administrator, the fees, costs and expenses of the Plan Administrator, any taxes, interest or penalties, payments, fees, charges or expenses of any kind that the Plan Administrator  may

10

incur pursuant to the Plan and the Plan Administrator Agreement and/or under applicable law or by order of the Court.

1.78     ***"Plan Assets"*** means (a) the cash balance of the Administrative Reserve on the Effective Date plus (b) the Additional Recoveries, plus (c) the Net Recoveries of Avoidance Actions, if any.

1.79     ***"Plan Supplement"*** means the compilation of documents and forms of documents, schedules and Exhibits to the Plan to be Filed no later than seven days before the Confirmation Hearing, which documents shall be in form and substance acceptable to the Prepetition Senior Secured Lender and Secured Noteholder on notice to parties in interest, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement (all in form and substance acceptable to the Prepetition Senior Secured Lender and Secured Noteholder). The Debtors shall have the right to amend the documents contained in, and Exhibits to, the Plan Supplement through the Effective Date with the consent of the Prepetition Senior Secured Lender and Secured Noteholder.

1.80     ***"Plan Support Agreement"*** means the Plan Support Agreement entered into as of July 7, 2014 by and among the Debtors (with the with the support of the Non-Debtor Parent and the Sponsor), the Prepetition Senior Secured Lender and the Secured Noteholder.

1.81     ***"Post-Effective Date Claims"*** means all Claims against and obligations incurred by the Plan Administrator on and after the Effective Date other than the Administrative Claims and Claims and Interests treated in Classes 1 through 6 of the Plan.

1.82     "***Prepetition Senior Secured Credit Agreement***" means the Amended and Restated Loan and Security Agreement by and among the Borrower and the Prepetition Senior Secured Lender, dated as of July 12, 2013 (as amended, restated, supplemented or otherwise modified from time to time).

1.83     ***"Prepetition Senior Secured Credit Facility"*** means that certain prepetition senior secured credit facility established by the Prepetition Senior Secured Credit Agreement.

1.84     ***"Prepetition Senior Secured Claim"*** means those claims held by the Prepetition Senior Secured Lender on account of amounts owed under the Prepetition Senior Secured Credit Facility. The Prepetition Senior Secured Claim shall be an Allowed Claim in the amount of $48,208.493.86.

1.85     ***"Prepetition Senior Secured Lender"*** means Wells Fargo Bank, National Association, together with its successors and assigns.

1.86     ***"Priority Non-Tax Claim"*** means any Claim of a kind specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code other than an Administrative Claim.

1.87     ***"Priority Tax Claim"*** means any Claim of a governmental unit of the kind specified in sections 502(i) or 507(a)(8) of the Bankruptcy Code.

1.88    ***"Pro Rata"*** means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

1.89    ***"Professional Claim"*** means a Claim of a professional retained in the Chapter 11 Cases pursuant to sections 327, 328 and 1103 of the Bankruptcy Code, or otherwise, for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Effective Date

1.90    ***"Professional Claim Bar Date"*** shall have the meaning set forth in Section [2.1(a)] of the Plan.

1.91    ***"Professional Fee Escrow Account"*** means the escrow account established pursuant to the DIP Order and funded by the Debtors and maintained by counsel to the Debtors for payment of Professional Claims.

1.92    ***"Professional Fee Order"*** means an order or orders establishing procedures for the interim compensation for Professionals that may be entered by the Bankruptcy Court.

1.93    ***"Record Date"*** or ***"Distribution Record Date"*** means the date that is two (2) Business Days after the entry of an order by the Bankruptcy Court approving the Disclosure Statement.

1.94    ***"Released Party"*** means each of: (a) the Debtors; (b) the Non-Debtor Parent; (c) the DIP Lender; (d) the Prepetition Senior Secured Lender; (e) the Secured Noteholder; (f) the Sponsor; (g) the B Holders and with respect to clauses (a) through (g) such entities predecessors, successors and assigns, parents, subsidiaries, affiliates, beneficial owners, managed accounts or funds, current and former officers, directors (including officers and directors of any of the Non-Debtor Parent), principals, shareholders, direct and indirect equity holders, members, partners (general and limited), employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

1.95    ***"Sale Proceeds"*** means, collectively, the proceeds received from the consummation of any sale approved by the Massif Sale Order and/or Footwear Sale Order net of ordinary and customary seller costs of closing, fees payable to seller's investment banker, Houlihan Lokey Capital, Inc. on account of the closing of such sale, seller's pro rata share of accrued and unpaid real and personal property ad valorem taxes on the assets sold, and applicable state and local transfer taxes, if any, payable by seller on account of the sale of such assets.

1.96    ***"Scheduled"*** means, with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest as set forth in the Schedules.

1.97    ***"Schedules"*** means the schedules of assets and liabilities filed in the Bankruptcy Court by the Debtors, as such schedules have been or may be amended or

12

supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.98    **"Section 503 Deadline"** shall have the meaning ascribed thereto in Section 2.3 of the Plan.

1.99    **"Secured Claim"** means a Claim secured by a properly perfected and unavoidable security interest in or lien upon property of the Estates to the extent of the value of such security interest or lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by the Debtors and the Claimholder.  Without limiting the generality of the foregoing, the DIP Facility Claim, the Prepetition Senior Secured Claim and the Secured Noteholder Claim shall be deemed to be a Secured Claim to the extent of the value of the property of the Estates that secure such Claim.

1.100    **"Secured Creditor"** means any Creditor that holds a Secured Claim.

1.101    **"Secured Note Documents"** means all documents relating to the 12% Secured Promissory Noted in the original face amount of $7,000,000 issued by the Debtors to GGC Tactical Debt Holdings, LLC.

1.102    **"Secured Noteholder"** means GGC Tactical Debt Holdings, LLC, together with its successors and assigns.

1.103    **"Secured Noteholder Claim"** means the secured Claim held by the Secured Noteholder.

1.104    **"Sponsor"** means Golden Gate Private Equity, Inc., Golden Gate Capital Management, L.L.C., Golden Gate Capital Management II, L.L.C., GGC Administration, L.L.C., Golden Gate Capital Investment Fund II, L.P., Golden Gate Capital Investment Fund II-A, L.P., Golden Gate Capital Investment Fund II, (AI) L.P., Golden Gate Capital Investment Fund II-A, (AI) L.P., Golden Gate Capital Associates II-QP, L.L.C., Golden Gate Capital Associates II-AI, L.L.C., CCG AV, L.L.C. (with respect to Series A, Series C and Series I of CCG AV, L.L.C.), GGC Opportunity Fund Management GP, Ltd., acting in its capacity as general partner of GGC Opportunity Fund Management, L.P., acting in its capacity as general partner of Golden Gate Capital Opportunity Fund, L.P., Golden Gate Capital Opportunity Fund-A, L.P., GGCOF Co-Invest, L.P. and GGCOF Third-Party Co-Invest, L.P.

1.105    **"Subsequent Distribution Date"** means any date, as determined by the Plan Administrator, with the consent of the Prepetition Senior Secured Lender and the Secured Noteholder, which is after the First Distribution Date and prior to the Final Distribution Date, on which the Plan Administrator commences a Distribution to Holders of Allowed Claims pursuant to the Plan.

1.106    **"Tax Refunds"** means the Claim of a Debtor for a refund of state or federal income taxes other than any refund of state income taxes received by a Debtor prior to the Petition Date.

13

1.107    ***"Third Party Claim"*** means a claim that is an Avoidance Action or other cause of action of one or more Debtors as of the Effective Date against any Person not otherwise released under a prior Order of the Bankruptcy Court or under the Plan.

1.108    ***"Unimpaired"*** refers to any Claim or Interest which is not Impaired.

## C.    Rules of Interpretation: Application of Definitions, Rules of Construction, and Computation of Time

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars are to United States dollars. Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## D.    Exhibits

All Exhibits are incorporated into and are a part of the Plan as if set forth in full herein and as may be filed with the Plan Supplement.

## ARTICLE II
## ADMINISTRATIVE CLAIMS

2.1    ***DIP Facility Claim.*** To the extent not earlier paid, any amounts outstanding under the DIP Facility shall be paid in full in cash on the Effective Date. Under no circumstances shall the DIP Lender or the Prepetition Senior Secured Lender be required to pay, nor shall any Sale Proceeds be used to pay, any Administrative Claim, Administrative Reserve, Administrative Tax Claim, Cure, Distribution Reserve, Priority Non-Tax Claim, Priority Tax Claim, Professional Claim or any other Claim with a priority junior to the DIP Facility Claim and the Prepetition Senior Secured Claim except as funded by and through the DIP Facility and in amounts not to exceed the amounts specified in the DIP Budget. In addition, nothing in the Plan shall be construed to reduce, diminish or offset the distribution to which the DIP Lender is entitled to receive under the Plan, and no portion of the distribution to which DIP Lender is

14

entitled under the Plan may be used for payment or satisfaction of any other Claim with a priority junior to the DIP Facility Claim and the Prepetition Senior Secured Claim.

### 2.2 *Administrative Claims - Professional Claims.*

(a) ***Final Fee Applications***.  All final requests for payment of Professional Claims must be filed no later than thirty (30) days after the Effective Date (the ***"Professional Claim Bar Date"***).  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court, and the balance due thereon shall thereafter be immediately paid in full in Cash by the Debtors from the Holdback Escrow Account to the extent such Professional Claims are entitled to be paid from the Professional Fee Escrow Account.

(b) ***Holdback Escrow Account***.  The Debtors' counsel shall maintain the Holdback Escrow Account.  On the Effective Date, the Debtors shall fund the Holdback Escrow Account with the Holdback Amount.  The unpaid balance of Allowed Professional Claims shall be paid by the Debtors from the Holdback Escrow Account.  All amounts remaining in the Holdback Escrow Account after payment of such Professional Claims, if any, shall be released to the Plan Administrator as Plan Assets.

(c) ***Payment of Interim Amounts***.  The provisions of the Professional Fee Order shall remain in effect as to amounts owing to professionals prior to the Effective Date.

(d) ***Post-Effective Date Services.***  After the Effective Date, any requirement that Professionals comply with the Professional Fee Order or sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.

### 2.3 *Administrative Claims - Substantial Contribution Compensation and Expenses Bar Date*.  Any person or entity who requests compensation or expense reimbursement for making a substantial contribution ("***Substantial Contribution Claim***") in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court on or before a date that is thirty (30) days subsequent to the Effective Date (the "***Section 503 Deadline***") and serve such application on counsel for the Debtors, counsel for the Prepetition Senior Secured Lender, counsel for the Secured Noteholder, counsel for the Creditors' Committee  and on all other parties as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Section 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.  All Allowed Substantial Contribution Claims shall be paid by the Plan Administrator from the Administrative Reserve within thirty (30) days of allowance by the Bankruptcy Court.

### 2.4 *Administrative Claims – Allowed Claims under section 503(b)(9) of the Bankruptcy Code.*  Allowed Administrative Claims under section 503(b)(9) of the Bankruptcy Code shall be paid by the Plan Administrator from the Administrative Reserve within thirty (30) days of allowance by the Bankruptcy Court.

2.5     ***Administrative Claims – Allowed Administrative Tax Claims under section 503(b)(1)(B) and (C) of the Bankruptcy Code.***  Allowed Administrative Claims under section 503(b)(1)(B) and (C) of the Bankruptcy Code shall be paid by the Plan Administrator from the Administrative Reserve as soon as practicable after the Effective Date.

2.6     ***Administrative Claims - Ordinary Course Expenses.***  Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid by the Plan Administrator from the Administrative Reserve in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

2.7     ***Other Administrative Claims Bar Date.***  All requests for payment of an Administrative Claim other than Professional Claims and DIP Facility Claims as set forth in Sections 2.3, 2.4, 2.5 and 2.6 of the Plan incurred on or after [August 15], 2014 must be filed with the Bankruptcy Court and served on counsel to the Debtors and counsel to the Plan Administrator no later than thirty (30) days after the Effective Date.  Unless the Plan Administrator objects to an Administrative Claim within ninety (90) days after the Effective Date, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Plan Administrator objects to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  All such Allowed Administrative Claims shall be paid by the Plan Administrator from the Administrative Reserve, then from the Plan Assets within thirty (30) days of allowance by the Bankruptcy Court.

2.8     ***Priority Tax Claims.***  On the Effective Date, or as soon as practicable after a Priority Tax Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each holder of an Allowed Priority Tax Claim against any of the Debtors shall be paid by the Plan Administrator in full in cash from the Plan Assets.

2.9     ***Remaining Cash***.  After the payment in full of all Allowed Administrative Claims, any Cash remaining in the Administrative Reserve after the final payment of such Administrative Claims and Allowed Priority Tax Claims shall be held by the Plan Administrator as Plan Assets to fund other payments under the Plan.

### ARTICLE III
### CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and their treatment is set forth in Article 2 above.

This Plan provides for the substantive consolidation of the Debtors.  All Allowed Claims and Allowed Interests are consolidated into the Classes set forth below.

16

| 3.1 | *Class 1.* | Class 1 consists of the Prepetition Senior Secured Claim |
| 3.2 | *Class 2.* | Class 2 consists of the Secured Noteholder Claim |
| 3.3 | *Class 3.* | Class 3 consists of all Miscellaneous Secured Claims. |
| 3.4 | *Class 4* | Class 4 consists of all Priority Non-Tax Claims. |
| 3.5 | *Class 5* | Class 5 consists of all General Unsecured Claims, including all Deficiency Claims. |
| 3.6 | *Class 6* | Class 6 consists of all Interests. |

## ARTICLE IV
## IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

4.1     ***Unimpaired Classes of Claims and Interests.***  Class 4 Priority Non-Tax Claims is not Impaired by the Plan.

4.2     ***Impaired Classes of Claims and Interests Entitled to Vote***.  Class 1 Prepeition Senior Secured Financing Claim, Class 2 Secured Noteholder Claim, Class 3 Miscellaneous Secured Claims, and the Class 5 General Unsecured Claims are Impaired under the Plan and are entitled to vote on the Plan.

4.3     ***Impaired Classes of Claims and Interests Deemed to Have Rejected the Plan.*** Class 6 Interests are Impaired under the Plan, shall receive no distributions under the Plan on account of their Interests and are deemed to have rejected the Plan.

## ARTICLE V
## PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

5.1     ***Class 1 (Prepetition Senior Secured Claim)***.  In exchange for full and final satisfaction, settlement, release and discharge of the Prepetition Senior Secured Claim, the Holder of the Prepetition Senior Secured Claim shall, after payment in full of the DIP Facility Claim, (i) be paid (or allowed to retain without provision or condition) all Cash Sale Proceeds from the sale of the Massif Assets, less the amount of the Administrative Reserve, and all Cash Sale Proceeds from the sale of the Footwear Assets; (ii) retain without provision or condition all Footwear Assets, if any, purchased by the Prepetition Senior Secured Lender or its assignee with a successful credit bid in conjunction with the sale of the Footwear Assets; (iii) receive payment in Cash of all holdbacks and escrows established at the closings of the sale of the Massif Assets and the closing of the Footwear Assets as and when payable to the seller; (iv) be assigned all rights of the seller to receive any future payment or other consideration owed to the seller under any asset purchase agreement, order, or other agreement related to the sale of the Massif Assets, including without limitation the seller's right to the "Earnout" under the Massif Asset Purchase

17

Agreement, and to the sale of the Footwear Assets; (v) receive payment in Cash of all Plan Assets that constitute Cash Collateral of the Prepetition Senior Secured Lender from whatever source that has not been paid to the DIP Lender or to the Prepetition Senior Secured Lender prior to or on the Effective Date; and (vi) receive relief from the automatic stay or other appropriate authority to pursue state law enforcement remedies against collateral for the Prepetition Senior Secured Credit Facility that has not been liquidated or collected as of the Effective Date. However, for purposes of voting, the Prepetition Senior Secured Claim shall be considered an Allowed Claim with the value of $[13,000,000] for voting under Class 1 of this Plan and $[35,208,493.86] for voting its Deficiency Claim in Class 5 of this Plan.  To the extent the Class 1 Claim is not paid in full, the Deficiency Claim of the Prepetition Senior Secured Lender shall be treated as an Allowed Class 5 General Unsecured Claim.  Nothing in the Plan shall be construed to reduce, diminish or offset the distribution to which the Prepetition Senior Secured Lender is entitled to receive under the Plan, and no portion of the distribution to which Prepetition Senior Secured Lender is entitled under the Plan may be used for payment or satisfaction of any other Claim with a priority junior to the Prepetition Senior Secured Claim. For avoidance of doubt, the Prepetition Senior Secured Lender is only entitled to payment on account of its Prepetition Senior Secured Claim up to the amount of its Allowed Prepetition Senior Secured Claim.

5.2        ***Class 2  (Secured Noteholder Claim).***  In exchange for full and final satisfaction, settlement, release and discharge of the Allowed Secured Noteholder, but only in the event that all obligations owed under the Prepetition Senior Secured Credit Facility are indefeasibly paid in full, the Holder of each Secured Noteholder Claim shall, receive payment in cash, after payment of the DIP Facility Claim, the Professional Claims, all Administrative Claims, all Priority Claims (including but not limited to Class 4 Priority Non-Tax Claims), the Distribution Reserves and the Class 1 Prepetition Senior Secured Claim, the remaining Plan Assets on the First Distribution Date.  If such Plan Assets are insufficient to satisfy Secured Noteholder in full, the Holder of the Secured Noteholder shall receive the Plan Assets distributed by the Plan Administrator upon each Subsequent Distribution Date and the Final Distribution Date until the Secured Noteholder is satisfied in full. However, for purposes of voting, the Secured Noteholder Claim shall be considered an Allowed Claim with the value of $[• ] for voting under Class 2 of this Plan and $[• ] for voting its Deficiency Claim in Class 5 of this Plan. To the extent the Class 2 Claim is not paid in full, the Deficiency Claim of the Secured Noteholder shall be treated as an Allowed Class 5 General Unsecured Claim.

5.3        ***Class 3 (Miscellaneous Secured Claims).***  Except to the extent that a Holder of an Allowed Class 3 Claim agrees to a less favorable treatment, the holder of each Allowed Class 3 Claim shall receive at the discretion of the Plan Administrator from the Plan Assets:  (i) Cash in an amount equal to the lesser of (a) the amount of Allowed Secured Claim and (b) the value of the Debtors' property securing such Allowed Secured Claim currently in the possession of the Debtors minus the amount of claims secured by such property with legal priority senior to the lien priority of the holder of such Allowed Class 3 Claim; (ii) delivery of the property securing such Allowed Class 3 Claim; or (iii) other treatment such that the Allowed Class 3 Claim shall be rendered Unimpaired.  Any Allowed Deficiency Claim of a Holder of an Allowed Class 3 Claim shall be treated as a Class 5 General Unsecured Claim.

18

5.4     ***Class 4 (Priority Non-Tax Claims).***  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as soon as practicable after the Effective Date. Allowed Priority Non-Tax Claims shall be paid as soon as reasonably practicable after the reconciliation of all Disputed Priority Non-Tax Claims.

5.5     ***Class 5 (General Unsecured Claims).***  Except to the extent that a Holder of an Allowed Class 5 General Unsecured Claim agrees to a less favorable treatment, the holders of each Allowed Class 5 General Unsecured Claim shall receive its Pro Rata share of the Plan Assets after payment of all Administrative Claims, Priority Claims, Allowed Class 1 Claims, Allowed Class 2 Claims, Allowed Class 3 Claims, Allowed Class 4 Claims and the funding of the Plan Administrator Expense Reserve.  If, as of the Final Distribution Date, there are no available Plan Assets to satisfy any Allowed General Unsecured Claims, Holders of General Unsecured Claims shall not receive any distribution on account of such General Unsecured Claims.

5.6     ***Class 6 (Interests).***  The holders of the Allowed Interests and Claims in Class 5 shall have their Interests against the Debtors extinguished as of the Effective Date and shall receive no distributions under this Plan.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THE PLAN

After the Effective Date, the Plan shall be implemented as follows:

6.1     ***Revesting of Assets.***  Except as otherwise expressly provided in this Plan, on the Effective Date, title to all Assets and property of the Debtors shall not revest in the Reorganized Debtors and shall not be released or waived.  Rather, the Debtors' Assets shall remain property of the Estate of the Debtors.  The Plan Administrator**,** after consultation with the Plan Administrator Oversight Committee, may affect the dissolution of any one or more of the Debtors at any time after the Effective Date.

6.2     ***The Plan Administrator.***

(a)     Appointment of the Plan Administrator.  As of the Effective Date, the Plan Administrator shall be vested with full legal power, capacity and authority, and shall be directed to administer, collect and liquidate the Debtors' remaining Assets and to implement the Plan. The Plan Administrator shall be [• ] under the Plan and Plan Administrator Agreement and approved by the Bankruptcy Court without bond, unless otherwise ordered by the Bankruptcy Court.

(b)     Powers of the Plan Administrator.  The Plan Administrator shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases, under the Plan or in any judicial proceeding or appeal to which the Debtor is a party, consistent with section 1123 (b)(3)(B) of the Bankruptcy Code and section 303 of the Delaware General Corporation Law, and is appointed as the representative of the Estates for all purposes, including for the retention and enforcement of all claims and rights, known and

unknown, which arose prior to the Confirmation Date.  On the Effective Date, the current officers and directors of each of the Debtors shall be deemed to have resigned and shall be fully discharged from their responsibilities and duties as officers and directors of the Debtors.  In general and subject to the protective provisions in the Plan, the Plan Administrator shall act for the Debtors and their respective estates in a fiduciary capacity as applicable to a board of directors.

(c)    Authorization.    The Plan Administrator shall be empowered and authorized to, among other things: (a) collect and liquidate the Debtors' remaining Assets; (b) make the distributions required under the Plan; (c) pursue, subject to the provisions of the DIP Order and in accordance with his (her or its) reasonable business judgment, Avoidance Actions; (d) retain and/or employ professionals; (e) exercise all power and authority that may be exercised by any officer, director or Holder of an Interest in such Debtor with like effect as if authorized, exercised and taken by unanimous consent of such officers, directors or Holders of Interests including, without limitation, amending any Debtor's organizational documents or dissolving any Debtor; (f) pursuing objections  to, and estimations and settlements of, Claims subject to the consent of the Creditors' Committee solely with respect to General Unsecured Claims and the consent of the Prepetition Senior Secured Lender and the Secured Noteholder with respect to all other Claims; (g) prosecuting, to the extent not otherwise released herein, any causes of action of the Estates, including, subject to the provisions of the DIP Order, Avoidance Actions, if any; (h) calculating and implementing all distributions to be made under this Plan to Creditors holding Allowed Claims; (i) marketing, selling, leasing or otherwise disposing of or realizing the value of all Assets; (j) filing all required tax returns and paying taxes and all other obligations on behalf of the Debtors; (k) file required operating reports; and/or (l) take all other actions required under the Plan to complete the liquidation, dissolution and wind-up of the Debtors in accordance with applicable non-bankruptcy law and the Plan.  The Plan Administrator shall serve as the Disbursing Agent under the Plan.  The Plan Administrator may also be authorized and directed to review, object to, prosecute, negotiate, settle or otherwise compromise any Claims, pending causes of action or other Avoidance Actions, subject to the consent of (i) the Prepetition Senior Secured Lender (with respect to any claim or cause of action that may generate proceeds constituting Cash Collateral of the Prepetition Senior Secured Lender), (ii) the Prepetition Senior Secured Lender and Secured Noteholder (with respect to Avoidance Actions), and (iii) the Creditors' Committee (with respect to General Unsecured Claims), in each case in accordance with Bankruptcy Rule 9019.  The powers granted to the Plan Administrator shall be exercisable without further approval of the Court and for avoidance of doubt, the Plan Administrator shall have no power, standing or authority to review, object to, prosecute, negotiate, settle or otherwise compromise any Claims, pending causes of action, Third Party Claims or other Avoidance Actions otherwise released under a prior Order of the Bankruptcy Court or under the Plan.

(d)    Liquidation of Assets.    The Plan Administrator shall pursue recovery of Assets  under the Plan in a commercially reasonable manner.

(e)    Compensation of the Plan Administrator's Professionals.    The Plan Administrator may compensate professionals retained by the Plan Administrator at the rates agreed upon by and between the Plan Administrator and his retained professionals without further order of the Court.  The Plan Administrator shall maintain appropriate reserves to fund

20

confirmation administrative expenses, post-confirmation administrative expenses, and operating expenses during the implementation of the Plan.  Such reserves shall be established in consultation with the Plan Oversight Committee.

      (f)    <u>Execution of Documents</u>.  The Debtors (or the Plan Administrator on behalf of the Debtors) may execute any and all documents and instruments necessary to effectuate the provisions of the Plan.

      (g)    <u>Standard of Care and Exculpation.</u>  The Plan Administrator, its professionals and its employees are exonerated, held harmless and indemnified by the Debtors and their Estates for any act or omission in respect of the Plan Administrator's duties under the Plan, except for gross negligence and willful misconduct (and may, but are not required to, maintain insurance for the purpose of such indemnification), as set forth in a Plan Administrator Agreement.

      6.3    ***Transfer Taxes.***  Any transfer of the Plan Assets or any portion(s) of the Plan Assets pursuant to the Plan shall constitute a "transfer under a plan" within the purview of section 1146(c) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar Taxes.

      6.4    ***Avoidance and other Third Party Claims***.  The Plan Administrator may pursue any Third Party Claim by informal demand and/or by the commencement of litigation. The Net Recoveries of such Third Party Claims will be Plan Assets.

      6.5    ***Effective Date.***  On the Effective Date, the Plan Administrator shall have the rights and powers set forth herein in order to carry out and implement the purposes and intent of the Plan.

      6.6    ***Records***.  The Plan Administrator shall be provided with originals or copies of all documents and business records of the Debtors necessary for the analysis and prosecution of Third Party Claims.  The Plan Administrator shall maintain such records until the earlier of: (i) the Final Distribution Date; or (ii) five years from the effective date of such document.  Thereafter, said records may be destroyed or otherwise disposed of, provided that 20 days prior notice of such intention to dispose of the records shall be provided to the Persons on the Debtors' Bankruptcy Rule 2002 service list.  If the Plan Administrator seeks to destroy or otherwise dispose of any records of the Debtors' Estates prior to the time periods set forth herein, the Plan Administrator shall be entitled to do so upon order of the Bankruptcy Court obtained on motion on twenty days negative notice to the Debtors' Bankruptcy Rule 2002 service list.

      6.7    ***Substantial Consummation.***  The Plan shall be deemed to be substantially consummated on the first date distributions are made in accordance with the terms of this Plan to any Claimholders.

## ARTICLE VII
## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1     ***Contracts and Leases.***  On the Effective Date, all Pre-Petition Date executory contracts, employment agreements and unexpired leases other than those leases and contracts that were previously assumed or rejected, except as set forth in Section 7.2 herein, shall be deemed automatically rejected as of that date or such earlier date as the Debtors may have unequivocally terminated such lease or contract. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code.

7.2     ***Employment, Indemnification and Other Agreements.***  The Plan Administrator may enter into employment, indemnification and other agreements with individuals who may be required to assist the Plan Administrator after the Effective Date.  Such agreements, in addition to director and officer liability policies and other insurance policies, shall remain in place after the Effective Date until such time as the Plan Administrator shall determine to either terminate or amend such agreements.

7.3     ***Payments Related to Assumption of Executory Contracts and Unexpired Leases.***  Except with respect to executory contracts and unexpired leases assumed under the prior Court orders, to the extent not already paid prior to plan confirmation, any monetary amounts by which each executory contract and unexpired lease to be assumed may be in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by Cure.  In the event of a dispute regarding (a) the nature or the amount of any Cure, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption and assignment.

7.4     ***Rejection Damages Bar Date.***  If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, the Plan Administrator or the properties of any of them unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors and the Plan Administrator within thirty (30) days after entry of an Order authorizing the Debtors to reject an executory contract or unexpired lease; provided, however, that notwithstanding the foregoing, in the case of an executory contract or unexpired lease "deemed rejected" pursuant to Section 7.1 of this Plan which results in a Claim, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Plan Administrator or the properties of any of them unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors and the Plan Administrator within thirty (30) days after the Effective Date.

7.5     ***Objections to Rejection Damage Claims.***  Objections to proofs of Claim for damages resulting from rejected executory contracts or unexpired leases shall be filed by the Plan Administrator with the Bankruptcy Court any time prior to the later of ninety (90) days after the Effective Date or sixty (60) days following the filing of such proofs of Claim for damages. Said objections shall be served upon the holder of the Claim to which such objection is made (or

22

holder's counsel, when applicable) and any Rejection Claim that is Allowed shall be paid from the Plan Assets.

## ARTICLE VIII
## PROVISIONS GOVERNING DISTRIBUTIONS

8.1     *Time of Distributions.*  Except as otherwise provided for herein, ordered by the Bankruptcy Court, or otherwise, distributions under the Plan shall be made as soon as is practicable on the later to occur of (a) the Effective Date, (b) the date a Claim becomes an Allowed Claim, or (c) the date that Cash becomes available for distribution to a particular Class pursuant to the treatment of such Class under the Plan.  The Plan Administrator shall provide for a holdback of a sufficient amount of Cash, which holdback shall be estimated to be sufficient to satisfy incurred and anticipated Post-Effective Date Claims incurred by the Plan Administrator and to provide for a hold-back with respect to Disputed Claims before making distributions under this Plan.  The Plan Administrator may make additional distributions of Cash and property received after the initial distributions.  Such additional distributions may be made at such times and in such amounts as determined by the Plan Administrator in consultation with the Plan Administrator Oversight Committee.

8.2     *Interest on Claims.*  Unless otherwise specifically provided for in the Plan or Confirmation Order, or as required by section 506 of the Bankruptcy Code, post-Petition Date interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

8.3     *Claims Administration Responsibility.*  The Plan Administrator shall retain sole responsibility for administering, disputing, objecting to, compromising or otherwise resolving issues related to distributions to Claimholders.

8.4     *W-9 Forms from Holders of Claims.*  The Plan Administrator may issue W-9 Forms to all creditors entitled to distribution to either (i) their last known addresses per the records obtained by the Plan Administrator from the Debtor or (ii) forwarding addresses provided by the United States Postal Service or by creditors themselves.  Creditors failing to return completed W-9 Forms to the Plan Administrator within 30 days of the Plan Administrator's request for a completed W-9 Form (or within any further time period expressly agreed to in writing between  the Plan Administrator and such Creditor), shall not share in any distribution provided for under the Plan.

8.5     *Distribution to General Unsecured Creditors.*  The Plan Administrator shall make distributions to Allowed Class 5 Claims, after satisfaction of the Claims in Classes 1, 2 and 3 and Administrative Claims as required by the Plan and setting aside a reserve for expenses of the Plan Administrator, from the remaining Plan Assets.

8.6     *Procedures for Treating and Resolving Disputed Claims.    No Distributions Pending Allowance*.  Except as set forth in Section 8.6(c) of this Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim

23

unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed by the Plan Administrator on or before the Business Day which is one hundred twenty (120) days after the Effective Date, unless such time period is extended by the Bankruptcy Court.

(h)    *Distribution Reserve*.   The Plan Administrator will withhold the Distribution Reserve from the property to be distributed under the Plan to Claimholders.  The Plan Administrator may request estimation for any Disputed Claim that is contingent or unliquidated, and the Plan Administrator will withhold the Distribution Reserve based upon the estimated amount of each such Claim as determined by the Bankruptcy Court.  If the Plan Administrator elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Plan Administrator will withhold the Distribution Reserve based upon the appropriate pro rata percentage distribution of the Face Amount of such Claim.

(i)    *Distributions After Allowance*.   Payments and distributions from the Distribution Reserve on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern the Class in which such Claim is classified. Promptly after the date when the order or judgment of the Bankruptcy Court allowing all or part of such Claim becomes a Final Order, the Plan Administrator shall distribute to the holder of such Claim any Cash allocated to such Claim in the Distribution Reserve that would have been distributed on the dates distributions were previously made on account of Allowed Claims had such Claim been an Allowed Claim on such dates.  All distributions made under this Section of the Plan on account of an Allowed Claim shall be made as if such Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claims.

(j)    *Partial Distributions*.   Notwithstanding any other provision of this Plan or the documents referred to by this Plan, the Plan Administrator may make one or more distributions to the holders of Disputed Claims, based on the distributions which such holders would otherwise be entitled to receive based on the undisputed portions of such Disputed Claims if same had not been objected to, if any. This power of direction may not be used to select individual Disputed Claims for payment. The Plan Administrator may make distributions on the undisputed portions of all Disputed Claims, or none at all.  Notwithstanding the foregoing, the Plan Administrator may not authorize or pay any distribution to entities who may be liable to the Plan Administrator with respect to a Third Party Claim or otherwise, which Disputed Claim may be paid, if at all, only after the holder of such Disputed Claim has discharged its liability to the Plan Administrator on account of the Third Party Claim or otherwise.

(k)    *Claims Allowable Against Multiple Debtors*.   Notwithstanding anything herein or in the Schedules to the contrary, to the extent a Claimholder has a Claim that is an Allowed Claim against more than one of the Debtors based upon the same ground or theory of liability, such Claim shall only be counted once for determination of distributions under the Plan.

8.7    *Delivery of Distributions.*   Distributions to Allowed Claims, other than Class 1 Claims, shall be delivered by the Plan Administrator  (a) to the addresses set forth on the

24

proofs of claim filed by such Claimholders (or at the last known addresses of such Claimholders if no proof of claim is filed or if the Debtors have been notified of a change of address), (b) to the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related proof of claim, (c) to the addresses reflected in the Schedules if no proof of claim has been filed and the Plan Administrator  has not received a written notice of a change of address, or (d) in the case of a Claimholder whose Claim is governed by an agreement and is administered by an agent or servicer, to the agent or servicer which shall then be responsible for making delivery of the distribution to such Claimholder.

8.8     ***Unclaimed or Undeliverable Distributions.***  If the distribution of any Claimholder, other than holders of Class 1 Claims, is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Plan Administrator is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest.  Amounts in respect of undeliverable distributions shall be returned to the Plan Administrator until such distributions are claimed.  All claims for undeliverable distributions shall be made on or before the thirtieth (30th) day after the Plan Administrator's final distribution under the Plan.  After such date, all property unclaimed by Claimholder shall revert to the Plan Administrator to be distributed in accordance with this Plan without regard to the application of escheat or similar laws.

8.9     ***Minimum Distribution***.  Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $25.00 in value.

8.10     ***Manner of Payment Under this Plan***.  The Cash distributions made pursuant to this Plan shall be made in U.S. dollars by checks drawn on domestic banks selected by the Plan Administrator, as applicable, or by wire transfer from a domestic bank selected at the option of the Plan Administrator.

8.11     ***Final Distribution Report***.  The Plan Administrator shall prepare and file with the Bankruptcy Court a final report (the ***"Final Distribution Report"***) twenty (20) days prior to making the final distribution under this Plan.  The report shall disclose the total amount distributed or to be distributed under this Plan.

8.12     ***Post-Final Distribution Assets***.  Any assets received by the Plan Administrator after the filing of the Final Distribution Report shall be tendered to the Holders of Allowed Claims in accordance with the distribution requirements otherwise set forth in this Plan.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

9.1     ***Compromise and Settlement of Claims, Interests and Controversies.***  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on

25

account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders, and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities.

9.2     ***Release of Liens.***  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Estate and its successors and assigns.

9.3     ***Releases by the Debtors.***  ON THE EFFECTIVE DATE OF THE PLAN, THE RELEASED PARTIES WILL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL ACTIONS, CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS OR NON-DEBTOR PARENT, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT THE DEBTORS, THE PLAN ADMINISTRATOR, THE DEBTORS' ESTATES OR THEIR AFFILIATES (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' LIQUIDATION, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR  CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR PERFORMANCE OF THE DIP LOAN FACILITY, THE PLAN SUPPORT AGREEMENT, THE PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD.

26

9.4     ***Releases by Holders.*** ON THE EFFECTIVE DATE OF THE PLAN, EACH HOLDER OF A CLAIM OR AN INTEREST IN THE DEBTORS SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY, RELEASED, ACQUITTED AND DISCHARGED THE RELEASED PARTIES (INCLUDING THE RELEASED PARTIES PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, SHAREHOLDERS, DIRECT AND INDIRECT EQUITY HOLDERS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS) AND THE RELEASED PARTIES FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS OR NON-DEBTOR PARENT, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH HOLDER (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' LIQUIDATION, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, INCLUDING THE NEGOTIATION, FORMULATION, PREPARATION OR PERFORMANCE OF THE DIP LOAN FACILITY, THE PLAN SUPPORT AGREEMENT, THE PLAN, THE DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD.

9.5     ***Liabilities to, and Rights of, Governmental Units.*** Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Plan Administrator; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

9.6    ***Exculpation.***  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, OBLIGATION, CAUSE OF ACTION OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE DEBTORS AND THE PLAN ADMINISTRATOR (AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS AND ATTORNEYS) HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

9.7    ***Injunction.***  FROM AND AFTER THE EFFECTIVE DATE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

9.8    FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX, THE DEBTORS AND HOLDERS OF CLAIMS OR INTERESTS SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII.

9.9    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO ARTICLE 9.3 OR ARTICLE 9.4, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE 9.6 ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING

28

ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

9.10    THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

9.11    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

9.12    ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE PLAN ADMINISTRATOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

9.13    ***Term of Injunctions or Stays.***  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

9.14    ***No Liability for Solicitation or Participation***.   As specified in section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale or purchase of securities.

9.15     *Compromises and Settlements*.   Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against them, and (b) claims that they have against other Persons.   The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle up to and including the Effective Date, Claims against them and claims that they may have against other Persons.   After the Effective Date, such right shall pass exclusively to the Plan Administrator to which such claims shall be conveyed pursuant to the Plan.

9.16     *Cancellation of Agreements*.   On the Effective Date, except to the extent of a right to receive a distribution under this Plan and as otherwise provided herein, any note, bond, Indentures or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed automatically cancelled; *provided, however*, that each agreement that governs the rights of the Claimholder and that is administered by an agent or a servicer, shall continue in effect solely for the purposes of allowing such agent or servicer to make the distributions to be made on account of such Claims or Interests under the Plan.

9.17     *Objections to Claims*.   The failure by the Debtors or the Plan Administrator to object to, or examine, any Claim or Interest for purposes of voting shall not be deemed a waiver of any such entities' right to object to (to the extent of any Claim that is not expressly Allowed in the Plan) or reexamine the Claim or Interest in whole or in part for any other purpose, including, but not limited to, distribution of property.

## ARTICLE X
## CONDITIONS PRECEDENT

10.1     *Conditions to Confirmation*.   The following is a condition precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 10.3 of the Plan:

(l)     The sale of the Massif Assets in accordance with the Massif Sale Motion shall have been approved by the Bankruptcy Court, such sale shall have closed based on a sale price of not less than $8,000,000, and all Sale Proceeds payable at closing of the sale of the Massif Assets shall have been paid at closing to the DIP Lender to pay in full any outstanding balance of the DIP Facility and the remaining Sale Proceeds shall have been paid at closing to the Prepetition Senior Secured Lender for provisional application to the unpaid balance of the Prepetition Senior Secured Claim.

(m)     The sale of the Footwear Assets in accordance with the Footwear Sale Motion shall have been approved by the Bankruptcy Court, such sale or sales shall have closed, and all Sale Proceeds payable at closing of the sale or sales of the Footwear Assets shall have been paid at closing to the DIP Lender to pay in full any outstanding balance of the DIP Facility and the remaining Sale Proceeds shall have been paid at closing to the Prepetition Senior Secured Lender for provisional application to the unpaid balance of the Prepetition Senior Secured Claim.

(n)     The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Prepetition Senior Secured Lender and the Secured Noteholder.

30

10.2     *Conditions to Effective Date*.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 10.3 of the Plan:

(o)     The Confirmation Order shall have been entered by the Bankruptcy Court;

(p)     No stay shall be in effect with respect to the Confirmation Order;

(q)     The Plan Administrator Agreement has been executed (no later than 30 days after entry of the Confirmation Order); and

(r)     The Debtors shall be in compliance with the Budget approved under the DIP Order.

10.3     *Waiver of Conditions to Confirmation and Effective Date.*  The conditions set forth in Sections 10.1 and 10.2 of the Plan may be waived by the Debtors with the consent of the Prepetition Senior Secured Lender and the Secured Noteholder without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors with the consent of the Prepetition Senior Secured Lender and Secured Noteholder regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XI
## RETENTION OF JURISDICTION

11.1     Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among other things, the following matters:

(s)     to hear and determine pending motions for the assumption and assignment of or rejection of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom, including the amount of Cure, if any, required to be paid in connection with such assumption and assignment;

(t)     to adjudicate any and all adversary proceedings, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, including, without limitation, any actions to recover any transfers, assets, properties or damages to which the Debtors may be entitled under applicable contract provisions, the provisions of this Plan or under applicable provisions of the Bankruptcy Code or any other federal, state or local laws;

(u)     to ensure that distributions to Allowed Claimholders and Allowed Interestholders are accomplished as provided herein;

(v)     to hear and determine any and all objections to the allowance or estimation of Claims and Interests filed both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest in whole or in part;

(w)     to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(x)     to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(y)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan or regarding the rights of the Plan Administrator;

(z)     to issue orders in aid of execution, implementation or consummation of the Plan;

(aa)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(bb)    to hear and determine all applications for compensation and reimbursement of Professional Claims under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(cc)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(dd)    to hear any other matter not inconsistent with the Bankruptcy Code;

(ee)    to hear and determine all disputes involving the existence, nature or scope of the releases provided for in the Plan;

(ff)    to hear and determine any Claims of or against the Debtors;

(gg)    to enforce all orders previously entered by the Bankruptcy Court; and

(hh)    to enter a final decree closing the Chapter 11 Cases.

Notwithstanding anything contained herein to the contrary and only to the extent the Bankruptcy Court has previously ordered otherwise, the Bankruptcy Court retains exclusive jurisdiction to hear and determine disputes concerning Claims, Interests, Third Party Claims and any motions to compromise or settle such disputes.  Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Plan Administrator chooses to pursue any Third Party Claim in another court of competent jurisdiction, the Plan

32

Administrator will have authority to bring such action in any other court of competent jurisdiction.

## ARTICLE XII
## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## IMPAIRED CLASSES OF CLAIMS OR INTERESTS

12.1    ***Impaired Classes of Claims and Interests Entitled to Vote***. Claimholders and Interestholders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Plan. The Debtors will tabulate votes on the Plan.

12.2    ***Acceptance by an Impaired Class***.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims or Interests shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half (½) in number of the Allowed Claims or Allowed Interests of such Class that have timely and properly voted to accept or reject the Plan.

12.3    ***Presumed Acceptances by Unimpaired Classes***.  Class 3 Priority Non-Tax Claims are Unimpaired by the Plan.  Under section 1126(f) of the Bankruptcy Code, such Claimholders are conclusively presumed to accept the Plan, and the votes of such Claimholders will not be solicited.

12.4    ***Class Deemed to Reject Plan***.  In the event the Court were to conclude that Class 6 Interests were impaired by virtue of the Debtors' estimate that the holders of Common Stock and Other Interests will not receive any distribution, Class 6 would also be conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  In either event, the votes of Class 6 Interestholders will not be solicited.

12.5    ***Non-Consensual Confirmation***.  In the event that less than all classes vote to accept the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

12.6    ***Confirmability and Severability of the Plan***.    The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied.  A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Debtors' ability to modify the Plan, subject to the consent of the Prepetition Senior Secured Lender and Secured Noteholder, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    ***Binding Effect***.  The Plan shall be binding upon and inure to the benefit of the Debtors, the Plan Administrator, all present and former Claimholders, all present and former Interestholders, other parties in interest and their respective successors and assigns.

13.2 ***Modification and Amendments***.   The Debtors may alter, amend or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing, but any such alteration, amendment, or modification shall require the consent of the Prepetition Senior Secured Lender and the Secured Noteholder. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Plan Administrator may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Claimholders or Interestholders under the Plan; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

13.3 ***Withholding and Reporting Requirements***.   In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

13.4 ***Creditors' Committee***. From and after the Effective Date, the Creditors' Committee shall exist for the sole purposes of: (a) consenting to the Claims reconciliation, objection, negotiation and settlement process conducted by the Plan Administrator solely with respect to General Unsecured Claims; (b) to enforce the terms of the Plan and payments on account of Allowed General Unsecured Claims; and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties; provided, however, the Debtors shall no longer be responsible for paying any fees or expenses incurred by members of the Creditors' Committee after the Effective Date, including fees and expenses of professionals of the Creditors' Committee.

13.5 ***Third Party Claims/Causes of Action***.   Unless otherwise released under a prior Order of the Bankruptcy Court or under the Plan, all Third Party Claims and Causes of Action are hereby preserved for prosecution and enforcement by the Plan Administrator.   The Plan Administrator, after consultation with the Plan Administrator Advisory Committee, shall have no obligation to perform an analysis of any Third Party Claims and Causes of Action.

13.6 ***Revocation, Withdrawal or Non-Consummation Right to Revoke or Withdraw***. The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date so long as the Debtors obtain the consent of the Prepetition Senior Secured Lender  and the Secured Noteholder for such revocation or withdrawal.

13.7 ***Severability of Plan Provisions***.   If prior to Confirmation any term or provision of this Plan which does not govern the treatment of Claims or Interests or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such

34

term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.8     *Trustee's Fees*.  All fees due and owing under 28 U.S.C. §1930 shall be paid on the Effective Date and thereafter, as due, until the cases are closed, converted or dismissed and final decreed, from the Plan Assets.

13.9     *Notices*.  Pursuant to Bankruptcy Rule 2002 and any applicable local Bankruptcy Rules, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon the U.S. Trustee's Office, counsel to the Debtors, counsel to the Prepetition Senior Secured Lender, counsel to the Secured Noteholder and counsel to the Plan Administrator and all persons on the Debtors' Bankruptcy Rule 2002 service list. With the exception of the Debtors, the Plan Administrator and the United States Trustee, any Person desiring to remain on the Debtors' Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Plan Administrator and the Debtors within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order.  Persons who do not file a request for continued service shall be removed from the Bankruptcy Rule 2002 service list.   Any notice required or permitted to be provided to the Debtors, the Reorganized Debtors, the Creditors' Committee, the Prepetition Senior Secured Lender, or the Secured Noteholder under the Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors or the Reorganized Debtors:

> Klehr Harrison Harvey Branzburg LLP
> 919 N. Market Street, Suite 1000
> Wilmington, DE 19801
> Attn: Domenic E. Pacitti

> If to the Plan Administrator:

> [_____]

> *with a copy to:*

> [_____]

If to the Prepetition Senior Secured Lender:

Winston & Strawn LLP
100 North Tryon Street
Charlotte, NC 28202-1078
Attn: Felton E. Parrish

If to the Secured Noteholder:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Joshua A. Sussberg
E-mail address: jsussberg@kirkland.com

If to the Creditors Committee:

[_____]

13.10    ***Term of Injunctions or Stays***.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

13.11    ***Governing Law***.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware shall govern the construction and implementation of the Plan, any agreements, documents and instruments executed in connection with the Plan, and corporate governance matters.

13.12    ***Waiver and Estoppel***.  Each Claimholder or Interestholder shall be deemed to have waived any right to assert that, by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, its Claim or Interest should be allowed in a certain amount, in a certain priority, secured or not subordinated if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court.

Dated:  July 8, 2014                           Respectfully submitted,


                                              Tactical Intermediate Holdings, Inc.
                                              Tactical Holdings Operations, Inc.
                                              Wellco Enterprises, Inc.
                                              Ro-Search Incorporated
                                              Mo-Ka Shoe Corporation
                                              Altama Delta Corporation
                                              Altama Delta (Puerto Rico) Corporation
                                              Massif Holdings, LLC
                                              Massif Mountain Gear Company, LLC


                              By:      */s/ Carlin Adrianopoli*              
                                       Carlin Adrianopoli
                                       Chief Restructuring Officer


37

**EXHIBIT A**

**Plan Administrator Agreement**

*To Be Supplied Prior to Disclosure Statement Hearing*

PHIL1 3693833v.11

**Exhibit B**

**Organizational Chart**



## Equity Ownership Of Massif Holdings LLC

| Member Name | Class A Units | Percentage Class A Units | Class B Units | Percentage Class B Units | Address |
|---|---|---|---|---|---|
| Tactical Holdings Operations, Inc. | 30,000,000.00 | 100.00% | | 0.00% | 5968 Commerce Blvd. Morristown, TN 37814 |
| Jeffrey K. Roberts | 0.00 | 0.00% | 445,000.00 | 52.26% | 1550 Stewart Rd. Grants Pass, OR 97526 |
| Christine A. Amen Living Trust | 0.00 | 0.00% | 300,000.00 | 35.23% | c/o Christine Amen P.O. Box 369 Merlin, OR 97532 |
| Christopher Wasgatt | 0.00 | 0.00% | 16,500.00 | 1.94% | 307 Meade St. Ashland, OR 97520 |
| Randy Benham | 0.00 | 0.00% | 90,000.00 | 10.57% | 106 NW F Street #312 Grants Pass, OR 97526 |
| **Total** | **30,000,000.00** | | **851,500.00** | | |

**<u>Exhibit C</u>**

**Cash Management Chart**

Case 14-11659-KG   Doc 13   Filed 07/08/14   Page 111 of 111

PRIVILEGED & CONFIDENTIAL
ATTORNEY – CLIENT WORK PRODUCT

